*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 04a0359p.06

# UNITED STATES COURTS OF APPEALS

## FOR THE SIXTH CIRCUIT

---

RENNIE B. VALENTINE-JOHNSON,

        *Plaintiff-Appellant,*

    *v.*

No. 03-1262

DR. JAMES G. ROCHE, Secretary, Department of the
United States Air Force,

        *Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 01-73345—John Feikens, District Judge.

Submitted: August 6, 2004

Decided and Filed: October 22, 2004

Before: CLAY and GILMAN, Circuit Judges; O'MALLEY, District Judge.[*]

---

## COUNSEL

**ON BRIEF:** Daniel A. Traver, TRAVER & WALZAK, Port Huron, Michigan, for Appellant. Vanessa M. Mays, UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.

---

## OPINION

---

    RONALD LEE GILMAN, Circuit Judge. Rennie B. Valentine-Johnson, an African-American woman, joined the United States Air Force in 1984. In 1993, she transferred from an Air Force base in Wyoming to become the Director of Family Readiness at the Selfridge Air Force Base in Michigan. While at Selfridge, Valentine-Johnson filed numerous equal employment opportunity (EEO) complaints that alleged race and sex discrimination, as well as retaliation, all in violation of Title VII of the Civil Rights Act of 1964. The Air Force terminated her employment two years later, purportedly for poor performance.

    Valentine-Johnson then sought to pursue her discrimination, retaliation, and termination claims together in a so-called "mixed case." A mixed case is one where a federal employee alleges that she suffered from an adverse agency action appealable to the Merit Systems Protection Board (MSPB), and that the action was also based on discrimination in violation of Title VII. Valentine-Johnson was unsuccessful

---

[*] The Honorable Kathleen M. O'Malley, United States District Judge for the Northern District of Ohio, sitting by designation.

in navigating the procedural maze for the processing of a mixed case because of erroneous advice given to her by the MSPB Administrative Judge (AJ) hearing her claims and because the MSPB AJ entertained a jurisdictional argument from the Air Force that the Air Force later disavowed.

On the Air Force's motion for summary judgment, the district court dismissed Valentine-Johnson's termination claims because she had failed to exhaust her administrative remedies before the MSPB. The district court also granted summary judgment on Valentine-Johnson's discrimination and retaliation claims because—divorced from her termination claim—she could not establish that she suffered from an adverse employment action. Finally, the district court dismissed Valentine-Johnson's hostile work environment claim that she based upon alleged sexual harassment. For the reasons set forth below, we **REVERSE** the district court's decision to dismiss Valentine-Johnson's discrimination, retaliation, and termination claims and **REMAND** the case for a new hearing that combines all three of these claims. On the other hand, we **AFFIRM** the judgment of the district court that dismissed Valentine-Johnson's hostile work environment claim.

## I. BACKGROUND

### A.     Factual background

Valentine-Johnson served for two years as Chief of Family Programs at the Warren Air Force Base in Wyoming. While in Wyoming, she filed an EEO complaint on the basis that she was subjected to racial discrimination. Valentine-Johnson was subsequently promoted to be the Director of Family Readiness at the Selfridge Air Force Base in Michigan. Her transfer to Selfridge in May of 1993 did not begin smoothly. A reservist on the base told her that she was not needed at Selfridge and that she should "move closer to Detroit." In the original itinerary that was provided to her, Valentine-Johnson was to be welcomed by someone of "appropriate rank." She alleges that after the Selfridge personnel learned that she was African American, they decided that her orientation could be handled by a low-level staffer.

In July of 1993, Valentine-Johnson traveled to Robbins Air Force Base in Georgia for training and orientation that was organized by Natalie Bassett, the Manager of Family Readiness at Air Force headquarters. During the visit, Valentine-Johnson told Bassett that she had filed an EEO complaint during her service in Wyoming. Valentine-Johnson alleges that thereafter Bassett "shunned" her. On another occasion when the two women were in a car together, Valentine-Johnson alleges that Bassett, who had had too much to drink, began berating her about the EEO complaint and called her an "uppity black nigger bitch." Valentine-Johnson also alleges that when Bassett came to Selfridge on a subsequent visit, Bassett informed Colonel Thomas Brown, who was Valentine-Johnson's initial supervisor, about the pending EEO complaint and told another officer that he should "watch" her.

When Colonel Brown learned of the Wyoming EEO complaint, Valentine-Johnson alleges that he told her "not to worry" about it, and that if she took care of him, he would take care of her. She contends that Colonel Brown's comment had a sexual overtone because there was allegedly "a parade of women meeting his needs." Valentine-Johnson specifically identified three different women on the base with whom he was allegedly having a sexual relationship.

Valentine-Johnson alleges that Colonel Brown touched her once in August of 1993, when he put his arm around her and walked her down the hall. This incident occurred after Valentine-Johnson had told Colonel Brown that she thought his touching of other women in the office was inappropriate. She therefore felt that Colonel Brown was deliberately showing her "that he could do whatever he wanted to do." Valentine-Johnson filed an EEO complaint about Colonel Brown putting his arm around her. She also alleges that on another occasion Colonel Brown invaded her "personal space" by standing too close, which made her uncomfortable.

Valentine-Johnson and the Air Force signed an agreement on October 21, 1993 to mediate the Wyoming EEO claim. The agreement expressly provided that the mediation was to be kept confidential.

When it came time for Valentine-Johnson to travel to Wyoming for the mediation, however, the travel order stated that the purpose of her trip was "EEO Mediation Hearing." Valentine-Johnson claims that disclosing the purpose of her travel breached the confidentiality provision of the mediation process. The order passed through many hands, and the fact that Valentine-Johnson was engaged in an EEO mediation allegedly "spread like wildfire."

According to the Air Force's regulations, Selfridge, as the base where Valentine-Johnson was currently employed, was responsible for paying for her travel to Wyoming. Colonel Brown apparently was unaware of this requirement and, when he observed the information on the travel order, allegedly screamed: "Hell no, I'm not going to pay for the God Damn trip" and "Get her the hell away from me." The trip was ultimately authorized and paid for by Selfridge, but when Valentine-Johnson returned, she alleges that the "harassment" and her "demise" began.

To start with, Colonel Brown said that he would no longer supervise Valentine-Johnson, so Major Mosher took over. Captain Sutton later succeeded Major Mosher. Because Major Mosher and Captain Sutton were of lower rank than Colonel Brown, Valentine-Johnson believed that this was degrading. Captain Sutton then began to schedule regular meetings, which Valentine-Johnson calls "browbeating sessions," about how to improve Valentine-Johnson's performance. The unpleasantness of these sessions for Valentine-Johnson was exacerbated because they occurred after everyone else had left work and the lights and telephones were turned off. Valentine-Johnson had requested that she be able to leave with everyone else at 4:30 p.m., but Captain Sutton refused to let her go at that time.

In her deposition, Valentine-Johnson describes other hostility that she allegedly experienced. She claims that base employee Rita Rozek came into her office on one occasion and cursed her out and that another base employee, Kimberly Fergan, told a training instructor that Fergan "didn't work with black people." Fergan also filed two allegedly false reports with the security police, claiming that Valentine-Johnson had assaulted her. Yet another employee at the base, Carol Shaw, was once alleged to have elbowed Valentine-Johnson. An African-American base employee, H. Manning, approached Valentine-Johnson and told her that he could not talk to her anymore because, if he did, he would be fired. Colonel Brown allegedly told the security police that they should not assist her, so that when she asked for an escort to her building after dark, they refused. Finally, someone at the base spread the false rumor that Valentine-Johnson was carrying a concealed weapon, causing her to be followed leaving her office on one occasion by a reservist carrying a loaded M-16.

Valentine-Johnson was hospitalized for depression and stress in December of 1993. She filed the first of 29 complaint letters with the EEO grievance office at Selfridge in January of 1994. Less than a week later, Valentine-Johnson and her husband had an "off-the-record" meeting with Colonel Brown and another officer. According to Valentine-Johnson's husband, Colonel Brown said that they were meeting about "what it will take to make this EEO stuff go away." Colonel Brown allegedly told Valentine-Johnson that "you are not going to get any help as long as you continue this EEO complaint." The meeting ended when Valentine-Johnson asked Colonel Brown for his opinion about interracial marriage, to which he replied that he was "shocked" that she had married a white man. (Roy Johnson, whom Valentine-Johnson married in September of 1993, is white.)

Valentine-Johnson alleges that she found it impossible to do her job. She claims that she was not given a job description or the material and personnel resources that she needed. The computer that was designated for her office sat on Colonel Brown's desk for 10 months. She was told that she was to supervise three people, but when she tried to reprimand them for partying, Colonel Brown said that they did not work for her. Roy Johnson, who initially worked as a volunteer in the Family Readiness Office, was told that he could no longer assist his wife, even though another married couple worked together in the Family Readiness Office at the Air Force base in New Orleans.

Neither Colonel Brown nor Major Mosher ever established performance objectives for Valentine-Johnson or gave her evaluations.  Although Captain Sutton did set forth job objectives for Valentine-Johnson, these requirements were purportedly so vague and subjective that it was impossible to attain the objectives.  Valentine-Johnson further contends that Captain Sutton always found her work product "unacceptable," even after Valentine-Johnson made the requested changes.  In August of 1994, Captain Sutton evaluated Valentine-Johnson and gave her unacceptable performance ratings of "1s" and "2s."  These ratings were markedly lower than the "fully successful" ratings of "8s" and "9s" that Valetine-Johnson had received in her prior postings.  Valentine-Johnson was fired in January of 1995 for performance deficiencies.  She was replaced by a white woman.

## B.     A "mixed-case" roadmap

Before entering the procedural morass in which Valentine-Johnson finds herself, an outline of the statutory and regulatory framework for the processing of cases like hers—which combine an adverse personnel action by a federal agency with claims of discrimination—might prove helpful.  A federal employee who is terminated and also alleges discrimination in violation of Title VII  presents a so-called "mixed case."  The employee must navigate the administrative regime that governs Title VII as well as the procedures for challenging an adverse personnel action under the Civil Service Reform Act.  Because the D.C. Circuit has accurately presented what it described as this "complicated tapestry" in clear language, we reproduce it below as follows:

> An employee who intends to pursue a mixed case has several paths available to her.  At the outset, the aggrieved party can choose between filing a "mixed case complaint" with her agency's EEO office and filing a "mixed case appeal" directly with the MSPB.  By statute, the relevant agency EEO office and the MSPB can and must address both the discrimination claim and the appealable personnel action.  Should she elect the agency EEO route, within thirty days of a final decision she can file an appeal with the MSPB or a civil discrimination action in federal district court.  If 120 days pass without a final decision from the agency's EEO office, the same avenues of appeal again become available: the complainant can file either a mixed case appeal with the MSPB or a civil action in district court.

> When a complainant appeals to the MSPB, either directly or after pursuing her claim with the agency EEO office, the matter is assigned to an Administrative Judge who takes evidence and eventually makes findings of fact and conclusions of law.  The AJ's initial decision becomes a final decision if neither party, nor the MSPB on its own motion, seeks further review within thirty-five days.  However, both the complainant and the agency can petition the full Board to review an initial decision.  Should the Board deny the petition for review, the initial decision becomes final; if the Board grants the petition, its decision is final when issued.  At this point, the complainant again has a choice: within thirty days of receiving a final decision from the MSPB, she can either appeal the discrimination claim to the EEOC, or appeal the entire claim (or any parts thereof) to the appropriate district court.  Finally, if the MSPB fails to render a judicially reviewable decision within 120 days from the filing of a mixed case appeal, the aggrieved party can pursue her claim in federal district court.

*Butler v. West*, 164 F.3d 634, 638-39 (D.C. Cir. 1999) (citations omitted).

## C.     Procedural background

In February of 1995, Valentine-Johnson filed a mixed case appeal with the MSPB, challenging her termination from the Air Force and alleging that the termination was caused by discrimination and retaliation in violation of Title VII.  Around the same time, EEOC hearings were scheduled on various EEO complaints, alleging discrimination, retaliation, and a hostile work environment that predated her termination.  The parties reached a procedural settlement agreement in March of 1995, wherein Valentine-

Johnson agreed to withdraw her mixed case appeal before the MSPB, but retained the option to refile it after the EEOC decided her outstanding EEO claims.

In December of 1995, the EEOC issued an order urging Valentine-Johnson to elect from three available options: (1) to continue to hold her termination claim in abeyance and have her EEO discrimination and retaliation claims heard by the EEOC; (2) to pursue her termination claim with the MSPB immediately, and move to consolidate the EEO claims with the termination claim as a "mixed case appeal;" or (3) to pursue her EEO claims regarding termination by filing a mixed case complaint with the Air Force, receive a Final Agency Decision (FAD) from the Air Force, and, if necessary, appeal the FAD to the MSPB. Under this third option, either party could have moved to consolidate the EEO claims. Valentine-Johnson chose the first option, which was essentially the terms set forth in the parties' settlement agreement.

Throughout 1996, Valentine-Johnson failed to respond to the Air Force's requests for discovery. The case was ultimately submitted for decision by the EEOC without a hearing because the parties made no progress in taking discovery or agreeing on a witness list. In a 113-page decision, the EEOC Administrative Law Judge (ALJ) concluded that Valentine-Johnson was unable to establish by a preponderance of the evidence a prima facie case of discrimination based upon race, sex, or reprisal. The EEOC ALJ also concluded that Valentine-Johnson had failed to offer sufficient evidence to substantiate her allegations of a hostile work environment based upon sexual harassment. Finally, as to all of her complaints, the EEOC ALJ found that the Air Force's proffered reasons for its actions were legitimate and not given as a pretext designed to mask discrimination. After the EEOC ALJ's decision was affirmed by the EEOC, Valentine-Johnson received a "right-to-sue" letter.

Valentine-Johnson filed suit in the United States District Court for the Eastern District of Michigan in August of 2001. In December of 2001, she reinstated her appeal to the MSPB regarding her termination claims. She indicated in her MSPB appeal that she was pursuing her discrimination claims in federal district court. The Air Force then filed a motion with the MSPB to dismiss her MSPB appeal with prejudice for lack of jurisdiction. In its motion, the Air Force argued that Valentine-Johnson's pleadings in federal district court made clear that she intended to pursue *both* her termination and her discrimination/retaliation claims in that forum, thereby precluding her appeal to the MSPB.

On March 1, 2002, an AJ for the MSPB held a telephone status conference with the parties. The MSPB AJ advised Valentine-Johnson that she had until March 15, 2002 to indicate whether "she wished to proceed with the Board appeal of her removal [termination] without consideration of her affirmative defenses of discrimination and retaliation for EEO activity." Valentine-Johnson contacted the MSPB AJ in early March to say that she had decided to withdraw her court case and concentrate on her appeal before the MSPB. This caused the MSPB AJ to advise Valentine-Johnson that if she terminated her court case, the MSPB would be limited to reviewing only her termination claim, not her discrimination and retaliation claims. Another option, the MSPB AJ said, was to "terminate the case presently before [the MSPB] by withdrawing her appeal . . . , which would terminate her administrative remedy and allow her complete case to proceed to court." Valentine-Johnson subsequently withdrew her MSPB appeal because she understood from the MSPB AJ that this would "allow her complete case to proceed in the U.S. District Court."

In a subsequent hearing before the district court, the Air Force made an about face in its position regarding the proper forum to hear Valentine-Johnson's termination claim. The Air Force said that it had been "mistaken" in its motion before the MSPB, where it had contended that *all* of Valentine-Johnson's claims should be heard in the district court. Now the Air Force argued that Valentine-Johnson was required to exhaust her termination claim before the MSPB. In ruling on the Air Force's motion for summary judgment, the district court agreed, holding that it could not consider Valentine-Johnson's termination claim because she had failed to exhaust her administrative remedies with the MSPB. The court also held that Valentine-Johnson could not establish a prima facie case of discrimination or retaliation because—her termination aside—she had not suffered an adverse employment action. As to her hostile work environment

claim based upon sexual harassment, the court held that Valentine-Johnson had not established that her work environment was objectively offensive. Valentine-Johnson timely appealed the district court's decision.

## II. ANALYSIS

### A.        Standard of review

This court reviews a district court's grant of summary judgment de novo. *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 629 (6th Cir. 2002). Summary judgment is proper where there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the district court must construe all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### B.        The consolidation of Valentine-Johnson's claims

Valentine-Johnson contends that the district court erred in dismissing her termination claim on the basis that she failed to exhaust her administrative remedies with the MSPB. She argues that she relied to her detriment on the MSPB AJ's representations that she could have her "complete case"—i.e., her termination, discrimination, and retaliation claims—heard in district court, whereas the MSPB could purportedly hear only her termination claim. The doctrine of judicial estoppel, she further posits, should bar the Air Force from contending that the district court had no jurisdiction over Valentine-Johnson's termination claim when the agency had previously maintained before the MSPB that *only* the district court had jurisdiction over all of her claims.

Resolution of this issue requires that we "attempt to loosen the jurisdictional Gordian knot formed when Title VII and civil service administrative claims are interlaced." *Sloan v. West*, 140 F.3d 1255, 1257 (9th Cir. 1998). Valentine-Johnson initially filed a "mixed case appeal" with the MSPB on February 1, 1995. On the appeal form she designated the appeal as a "mixed case" and specified that she was contesting her "removal," which she alleged was also an instance of "illegal discrimination [and] reprisal."

At the same time, however, Valentine-Johnson had various outstanding EEO claims, which covered allegations of sex and race discrimination, reprisal, and sexual harassment based on the incidents described in Part I.A. above. Because all of her EEO claims were filed *before* she was terminated, they did not include her termination claim. But they did include other personnel actions taken by the Air Force, such as the change in her supervisors, her negative performance ratings, and the performance improvement conferences.

The Air Force filed a motion to dismiss with the EEOC, pointing out that Valentine-Johnson had already filed a mixed case appeal with the MSPB. It also argued that because all of her EEO claims were intertwined with her termination, they should be heard by the MSPB. According to the EEOC ALJ, Valentine-Johnson appeared to believe that she had legitimate EEO claims that were not connected with her termination. The EEOC ALJ was concerned, however, that Valentine-Johnson did not adequately understand her election of remedies, so the ALJ deferred ruling on the EEO claims in order to give Valentine-Johnson time to make an informed decision. As noted above, the EEOC ALJ stated at a prehearing conference on March 6, 1995 that Valentine-Johnson could (1) fragment her claims, pursuing her EEO claims that arose prior to her termination with the EEOC and then take up her mixed case appeal with the MSPB at a later time, (2) file a mixed case appeal with the MSPB immediately, or (3) file a mixed case complaint with the Air Force's EEO office. If Valentine-Johnson had chosen either option (2) or option (3), she could have consolidated her outstanding EEO claims with her mixed case, which, in hindsight, would have been the best approach.

Valentine-Johnson instead chose the first option—the immediate pursuit of her outstanding EEO claims with the EEOC, with the understanding that she would file a mixed case appeal, combining her discrimination, retaliation, and termination claims with the MSPB at a later date. Initially, however, she did not appear to fully understand the implications of her choice. Although the letters are not in the record, the EEOC ALJ noted that Valentine-Johnson wrote a series of letters to the Air Force indicating her belief that her termination claim could still be heard by the EEOC. The Air Force sought clarification from the ALJ, who subsequently reiterated Valentine-Johnson's options in a formal order in December of 1995. Valentine-Johnson responded by reaffirming her original election.

The procedural difficulty started after the EEOC rendered its final decision on her non-mixed (meaning discrimination claims that predated her termination) EEO complaints, finding no discrimination, reprisal, or sexual harassment. Valentine-Johnson then received and acted upon her right-to-sue letter by filing a complaint in district court. Her complaint, however, requested relief that was related to her termination, i.e., reinstatement and payment of back wages and benefits. This was improper because the EEOC had not heard or rendered a decision on Valentine-Johnson's termination claim. The suit was also contrary to the parties' settlement agreement, which specified that after the EEOC decision, she would refile her mixed case appeal with the MSPB.

Roy Johnson, acting as his wife's personal representative, then refiled her appeal with the MSPB. One section of the appeal contained the following caption: "The Discrimination Issues are Filed in U.S. District Court." Perhaps Valentine-Johnson meant that only her EEO claims that predated her termination were being heard in district court, but that she still intended the MSPB to hear her discrimination and retaliation claims related to being terminated (her mixed claims). The appeal to the MSPB does not support that interpretation, however, because discrimination is not mentioned as a basis for her "wrongful termination." Rather, the appeal implies that Valentine-Johnson sought to prove that she was a competent employee who was not given sufficient guidance about how to perform her job and was unfairly evaluated. In effect then, Valentine-Johnson's filings in district court and with the MSPB suggested that she intended to pursue a stand-alone termination claim (i.e., without a discrimination component) with the MSPB and to have her mixed termination claim (i.e., with a discrimination component) heard in district court. This was directly contrary to the parties' agreed-upon election of remedies, which was to have Valentine-Johnson's mixed termination claim heard before the MSPB.

The Air Force subsequently filed a motion to dismiss with the MSPB, pointing out that Valentine-Johnson was raising her termination claim in the district court, so that the MSPB should dismiss her appeal related to her termination for lack of jurisdiction. For support, the Air Force relied on a rule established by the Federal Circuit in *Connor v. United States Postal Service*, 15 F.3d 1063, 1066 (Fed. Cir. 1994), to the effect that where the filing of a complaint in the district court *precedes* the filing of an appeal with the MSPB, the MSPB has no jurisdiction over the case. *See also Leahy v. Merit Sys. Prot. Bd.*, 251 F.3d 170, 2000 WL 1810021 (Fed. Cir. Dec. 11, 2000) (unpublished) (same). Because the sequence of Valentine-Johnson's filings was similar to those in *Connor* and *Leahy*, the Air Force argued that the MSPB should dismiss her appeal for lack of jurisdiction so that the mixed case could be heard in district court.

The MSPB AJ subscribed to the thrust of the Air Force's argument. In an order summarizing the telephonic status conference held on March 1, 2002, the MSPB AJ made the following comments:

> I originally advised the parties that it was my intention to dismiss the appeal without prejudice *because the appellant had filed a law suit in the U.S. district court that included removal as an issue.* The agency subsequently requested me to dismiss the appeal with prejudice, i.e., without the right for it to be refiled with the Board, because of the court case.
>
> During the conference, *the parties confirmed that the removal remained an issue in the District Court case*, which is scheduled for trial in October. I nevertheless did not grant the agency's motion to dismiss the appeal. I gave the appellant until March 15, 2002, to advise

me if she wished to proceed with the Board appeal of her removal without consideration of her affirmative defenses of discrimination and retaliation for EEO activity.

(Emphasis added.)

The MSPB AJ did not grant the Air Force's motion. But there was a common understanding among the parties that Valentine-Johnson's termination claim and her discrimination/retaliation claims were before the district court, even though the district court did not have original jurisdiction over Valentine-Johnson's termination claim. The MSPB AJ reaffirmed this understanding in a subsequent telephone conversation with Valentine-Johnson. When Valentine-Johnson called the AJ about dropping the district court case, the MSPB AJ provided the following advice:

I returned her call to tell her that the Board had jurisdiction over only the removal [termination] action and would not adjudicate her other claims of discrimination. *If she withdraws her civil action completely, there would be no further review of her allegations of discrimination with regard to agency actions other than her removal.* I also told appellant that she could terminate the case presently before me by withdrawing her appeal to the Board, which would terminate her administrative remedy *and allow her complete case to proceed in court*.

(Emphasis added.)

This guidance from the MSPB AJ was erroneous. Had Valentine-Johnson followed her own instinct by dismissing her district court case without prejudice, she could have consolidated her discrimination and retaliation claims with her termination claim in a mixed case appeal before the MSPB, as specified in the parties' settlement agreement. From the very beginning, moreover, Valentine-Johnson maintained that her termination was motivated by discrimination based on race and sex, and by reprisal. On the other hand, there is no question that Valentine-Johnson contributed to the confusion by filing a district court complaint that included her termination claim, and by filing a MSPB appeal that did not reference her discrimination claims.

Based on the MSPB AJ's explanation—a position that the Air Force also supported—Valentine-Johnson had two options: (1) to pursue her termination appeal before the MSPB without reference to any discriminatory or retaliatory acts, or (2) to pursue her "complete case" in the district court. Valentine-Johnson, unsurprisingly, chose the latter.

Once in the district court, the Air Force made a 180-degree change in its position, arguing that because Valentine-Johnson had failed to exhaust her administrative remedies with the MSPB regarding her termination claim, this claim could not be heard in the district court. The Air Force relies principally on *McAdams v. Reno*, 64 F.3d 1137 (8th Cir. 1995), where the court interpreted the federal regulation on election of remedies as requiring exhaustion in the chosen forum. In *McAdams*, the plaintiff filed a mixed case appeal with the MSPB, but later abandoned her discrimination claims in that forum and sought to have them heard instead in a separate district court action. "Having chosen that option" [to proceed before the MSPB], the *McAdams* court held that "she was required to exhaust her claims in [the MSPB] before filing a civil action." *Id*. at 1142; *see also Economou v. Caldera*, 286 F.3d 144, 149 (2d Cir. 2002) (holding that Economou's filing of his first formal petition with the MSPB "designated the MSPB as the administrative forum in which Economou was bound to exhaust his claims.")

The Ninth Circuit, in *Bankston v. White*, 345 F.3d 768 (9th Cir. 2003), pointed out that the result in *McAdams* was actually dictated by Title VII's exhaustion-of-remedies requirements, and suggested that exhaustion is not an absolute requirement for other types of claims. *Id*. at 771 (noting that *McAdams* relied on Title VII's exhaustion requirement and did not require the plaintiff to exhaust his administrative remedies for his ADEA claim). *McAdams,* moreover, is not precisely on point in the present case because Valentine-

Johnson *did* exhaust her initial EEO discrimination and retaliation claims through the EEOC process; it is her termination claim before the MSPB that she failed to exhaust.

Requiring the exhaustion of administrative remedies prior to filing suit in district court is, however, a generally accepted principle. *See, e.g., Ayrault v. Pena*, 60 F.3d 346, 349 (7th Cir. 1995) (holding that the plaintiff's failure to file a claim with the MSPB meant that she had not exhausted her administrative remedies, which "waives a right to judicial review"); *Vinieratos v. United States*, 939 F.2d 762, 772 (9th Cir. 1991) ("The law requires an aggrieved federal employee to elect one exclusive administrative remedy and to exhaust whatever remedy he chooses."); *German v. Pena*, 88 F. Supp. 2d 222, 225 (S.D.N.Y. 2000) ("[A] claimant must exhaust all available administrative remedies prior to bringing his action in the federal courts.") Because Valentine-Johnson admittedly did not exhaust her administrative remedies with the MSPB, the district court's determination that it could not hear her termination claim has presumptive legal support.

In our view, however, the special factual circumstances of this case and applicable principles of equity require that Valentine-Johnson's termination claim be heard in the district court. Valentine-Johnson persuasively argues that judicial estoppel prevents the Air Force from changing its position regarding the district court's review of her termination claim. Judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quotation marks omitted). In order to invoke judicial estoppel, Valentine-Johnson must show that the Air Force "took a contrary position under oath in a prior proceeding and that the prior position was accepted by the court." *Teledyne Indus., Inc. v. NLRB*, 911 F.2d 1214, 1218 (6th Cir. 1990).

The Air Force does not dispute that it filed a motion to dismiss the MSPB appeal on the basis that Valentine-Johnson's termination claim should be heard in the district court. Once in the district court, the Air Force promptly reversed course and sought to block the court's review of the termination claim. Although the MSPB AJ did not grant the Air Force's motion, the AJ "originally advised the parties that it was my intention to dismiss [the MSPB] appeal without prejudice because the appellant had filed a law suit in the U.S. district court that included her removal as an issue." The AJ also appeared to accept the Air Force's position when, in a telephone conversation with Valentine-Johnson, the AJ explained that if Valentine-Johnson withdrew her appeal before the MSPB, that would "allow her complete case to proceed in court."

Although the Air Force did not testify "under oath," the agency did "present[] to the court . . . a . . . written motion . . . certifying that to the best of [its] knowledge . . . the claims, defenses, and other legal contentions therein [we]re warranted by existing law." Fed. R. Civ. P. 11(b). We believe that the Air Force's written filing, combined with arguing the merits of its motion in a conference with the MSPB AJ, may be fairly analogized to taking a position "under oath" for the purposes of judicial estoppel. *See Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.2d 23, 30-31 (1st Cir. 2004) (noting that judicial estoppel is an equitable doctrine invoked by a court in its discretion and that the amorphous nature of judicial estoppel suggests that the appropriate standard of review should be abuse of discretion, which is both deferential and flexible); *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282 (11th Cir. 2002) (noting that the circumstances under which judicial estoppel may be invoked are not reducible to any general formulation of principle and that there are no inflexible or exhaustive prerequisites for determining the applicability of the doctrine).

Similarly, we recognize that the AJ did not explicitly grant the Air Force's motion, but as a practical matter the AJ adopted and indeed advanced the Air Force's position to the detriment of Valentine-Johnson. In the interest of preventing the Air Force from "abusing the judicial process through cynical gamesmanship, achieving success on one position, then arguing the opposite to suit an exigency of the moment," *Teledyne*, 911 F.2d at 1218, we conclude that judicial estoppel is applicable as one of two reasons that Valentine-Johnson may present her termination claim in the district court.

The other reason why Valentine-Johnson is entitled to have her termination claims heard in the district court is the misleading advice that she received from the MSPB AJ. In the present case, Valentine-Johnson clearly relied on the MSPB AJ's representation that the only place where she could have all of her claims heard was in the district court. Valentine-Johnson telephoned the AJ because she wanted to dismiss her court case and proceed solely before the MSPB. Having all of her claims consolidated before the MSPB would have been consistent with the parties' settlement agreement and was also the correct procedural route by regulation. *See* 29 C.F.R. § 1614.302. Instead, the AJ discouraged Valentine-Johnson from pursuing her mixed case appeal through the MSPB by telling her that the MSPB could not hear her discrimination claims, which was inaccurate as a matter of law.

We note that at least two courts have rejected a plaintiff's claim to equitable relief based on erroneous advice from the government. *See McAdams*, 64 F.3d at 1143 (holding that the plaintiff's receipt of incorrect information from the DOJ and the EEOC did not create a right to sue in federal court); *Williams v. Munoz*, 106 F. Supp. 2d 40, 44 (D.D.C. 2000) (holding that misinformation from an ALJ is not enough to support waiver of the exhaustion requirement). In *McAdams*, however, the court relied in part on the fact that the plaintiff could not establish reliance on the erroneous advice. *See also Ferry v. Hayden*, 954 F.2d 658, 661-62 (11th Cir. 1992) (holding that for the plaintiff to successfully invoke equitable estoppel based on government-supplied misinformation, the plaintiff must show detrimental reliance). And in *Williams* the court noted that plaintiff's reliance claim was undermined by the fact that she was represented by counsel.

Valentine-Johnson, by contrast, can clearly show reliance and was, at critical times, proceeding without the benefit of legal counsel. Moreover, "[s]he plainly made a good faith effort to comply with administrative procedures," and such "effort is something this Court should consider in determining whether a party has exhausted administrative remedies." *Premier Electronics Lab. v. Aston*, 686 F. Supp. 812, 815 (N.D. Cal. 1988). We therefore conclude that the erroneous advice from the MSPB AJ is an additional factor that weighs in favor of having Valentine-Johnson's "complete case" heard in the district court.

Although the district court will not have an administrative record from the MSPB to review, this court has previously rejected the argument that "nondiscrimination claims must always be reviewed on an administrative record." *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 472 (6th Cir. 2003). In fact, "[p]arallel proceedings in the district court and the MSPB are contemplated by [the relevant statute]." *Evono v. Reno*, 216 F.3d 1105, 1110 (D.C. Cir. 2000). The statutory scheme provides that a district court may independently review claims without the benefit of a final decision from the MSPB. *See* 5 U.S.C. § 7702(e)(1)(B) (permitting a plaintiff to seek relief in district court if the MSPB does not issue its opinion within 120 days).

In the present case, Valentine-Johnson's discrimination and retaliation claims were dismissed by the district court because she could not show—in the absence of her termination claim—that she suffered an adverse employment action. Her termination claim was subsequently dismissed because she was found not to have exhausted her administrative remedies before the MSPB. We conclude that this outcome is inequitable and unjust because of the unique confluence of the following factors: (1) the parties' settlement agreement specified that Valentine-Johnson had the option to have all of her claims eventually consolidated before the MSPB; (2) the MSPB AJ gave Valentine-Johnson erroneous advice, upon which Valentine-Johnson relied to her detriment; (3) the Air Force abused the judicial process with its shifting jurisdictional arguments; and (4) Valentine-Johnson was, at critical times, proceeding pro se, and making her best effort to have all of her claims heard.

Under the above circumstances, we will reverse the dismissal by the district court of Valentine-Johnson's discrimination, retaliation, and termination claims and remand the case for a new hearing that will allow her to present all of those claims before the court. At the same time, we want to make clear that by so holding we are not suggesting that plaintiffs under normal circumstances are free to ignore the statutory

procedures for mixed cases as set forth in 29 C.F.R. § 1614.302(a). Nor do we endorse routinely bypassing the exhaustion of administrative remedies before the MSPB.

**C.        Valentine-Johnson's hostile work environment claim based upon sexual harassment**

Valentine-Johnson's remaining claim before the district court was one of an allegedly hostile work environment based upon sexual harassment. She "may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." *Burnett v. Tyco Corp.*, 203 F.3d 980, 982 (6th Cir. 2000) (quotation marks omitted). To prevail on this claim, Valentine-Johnson must show that "(1) she is a member of a protected class; (2) she was subject to unwelcomed sexual harassment; (3) the harassment was based on her sex; (4) the harassment unreasonably interfered with her work performance and created a hostile work environment; and (5) [the employer] knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action." *Blankenship v. Parke Care Centers, Inc.* 123 F.3d 868, 872 (6th Cir. 1997) (quotation marks omitted).

Valentine-Johnson, as a woman, is a member of a protected class. She alleges that she was subject to unwelcome conduct that was based on her sex. But "[f]or sexual harassment to be actionable, it must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." *Burnett*, 203 F.3d at 982 (quotation marks omitted). In order to evaluate whether an environment is hostile, we look at the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id*. (quotation marks omitted).

The district court held that Valentine-Johnson had failed show that her work environment was objectively offensive. She alleges only one incident that involved actual touching—when Colonel Brown put his arm around her while walking down the hall. On another occasion she objected to Colonel Brown's standing too close to her. Valentine-Johnson was also offended by what she perceived to be inappropriate behavior between Colonel Brown and *other* women at Selfridge. Because of this purported sexually charged atmosphere, Valentine-Johnson believed that Colonel Brown's comment that he would "take care of her" if she was "nice to him" was a reference to sex. She does not allege, however, that Colonel Brown ever followed up on this remark.

Colonel Brown's physical interaction with Valentine-Johnson was not frequent, severe, physically threatening, or humiliating. Likewise, there is no proof that his behavior with other women in the office, who were apparently willing participants, "unreasonably interfered" with Valentine-Johnson's own work performance. This court has rejected hostile work environment claims under circumstances that were far more sexually offensive. *See, e.g.*, *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 790 (6th Cir. 2000) (holding that the employer's alleged request for sexual favors from the employee in exchange for a better evaluation, calling the employee "Hot Lips," making comments about the employee's state of dress, and telling dirty jokes in front of the employee did not create hostile working environment); *Burnett*, 203 F.3d at 985 (holding that the conduct of a supervisor who placed a pack of cigarettes under a female employee's bra strap, remarked that she had "lost her cherry," and said he was aroused by the phrase "dick the malls" was not sufficiently severe to create a hostile work environment); *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997) (holding that a supervisor's teasing about the employee dancing on tables at a local strip bar, joking about "Hooterville" or "Titsville," calling her a "broad," and making fun of her pronunciation of "bosom" did not create an objectively hostile environment). In light of this circuit's precedents and the isolated and *de minimis* nature of Colonel Brown's conduct, we conclude that the district court did not err in granting summary judgment to the Air Force on Valentine-Johnson's hostile work environment claim.

### III. CONCLUSION

For all of the reasons set forth above, we **REVERSE** the district court's decision to dismiss Valentine-Johnson's discrimination, retaliation, and termination claims and **REMAND** the case for a new hearing that combines all three of these claims. On the other hand, we **AFFIRM** the judgment of the district court that dismissed Valentine-Johnson's hostile work environment claim.