RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 06a0338p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

JOSEPH CARLETON HARDESTY, et al.,
> *Plaintiffs-Appellants,*

*v.*

No. 05-1346

HAMBURG TOWNSHIP, et al.,
> *Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 03-72054—John Feikens, District Judge.

Argued: June 8, 2006

Decided and Filed: September 1, 2006

Before: MARTIN, NORRIS, and McKEAGUE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Peter J. Osetek, OSETEK & ASSOCIATES, Ann Arbor, Michigan, for Appellants. Marcia L. Howe, JOHNSON, ROSATI, LaBARGE, ASELTYNE & FIELD, Farmington Hills, Michigan, G. Gus Morris, KUPELIAN, ORMOND & MAGY, Southfield, Michigan, for Appellees. **ON BRIEF:** Peter J. Osetek, OSETEK & ASSOCIATES, Ann Arbor, Michigan, for Appellants. Marcia L. Howe, JOHNSON, ROSATI, LaBARGE, ASELTYNE & FIELD, Farmington Hills, Michigan, G. Gus Morris, KUPELIAN, ORMOND & MAGY, Southfield, Michigan, for Appellees.

McKEAGUE, J., delivered the opinion of the court, in which NORRIS, J., joined. MARTIN, J. (pp. 9-11), delivered a separate dissenting opinion.

_____

## OPINION

_____

McKEAGUE, Circuit Judge. Plaintiffs appeal the summary judgment for Defendants in this civil rights action alleging violation of Plaintiffs' Fourth Amendment right to be free from unreasonable search and seizure. For the following reasons, we affirm the district court's dismissal of all claims, but on different grounds.

## I. BACKGROUND

On May 27, 2001, at 2:11 a.m., Officer Bullock arrested Julie Taylor, a minor, for drunk driving. Taylor told Bullock that she had been consuming alcohol with Joseph Hardesty at the

Hardestys' home. Officer Sanderson went to the Hardesty residence and kept it under observation to ensure no other intoxicated minors attempted to drive away. After Bullock completed booking Taylor, he met Sanderson and Officer Garbarcik at the Hardesty home to investigate the situation. Shortly before Bullock arrived, Sanderson and Garbarcik approached the front door of the Hardesty residence. They pounded on the front door, but received no response.[1] The officers then contacted Livingston County dispatch and dispatch telephoned the Hardestys' home, but nobody answered. The officers knew where Plaintiff Kenneth Hardesty worked and called his workplace but were unable to get in touch with him. Sanderson and Garbarcik believed someone was home because they had observed lights in the house go off as they approached the house. When there was no response at the front door or to the phone calls, the officers went around to the back of the house to try to contact the people inside. Bullock arrived on the scene in time to go around to the back of the house with Sanderson and Garbarcik.

The Hardestys have a deck on the back of their home. This deck has stairs leading up to it from the yard, and there is an entrance into the home from the deck. There are no pathways leading from the front yard or front door to the deck. The three officers went around the house and onto the deck and looked through the windows and sliding glass door into the house. The officers testified that they observed Ryan Adam Dean inside, lying on a couch, with blood on his hands and pants. The officers attempted to wake Dean by shining flashlights in his face and pounding on the window. The officers allege that Dean did not respond or even move and that he appeared to not be breathing. The officers contacted Sergeant DeBottis and advised him of the situation. DeBottis told the officers that they should enter the house to check on the well-being of Dean, but should do as little damage as possible entering the house.

The officers entered a car parked in the driveway and used a garage door opener, found therein, to enter the home. Two officers from the Pinckney Police Department arrived on the scene in time to enter the house with the Hamburg officers. All the officers entered the Hardesty residence through the garage without the permission of the owners or a warrant.

Inside the house, the officers found three males under the age of twenty-one–Plaintiff Joseph Hardesty and his friends Ryan Dean and Tim Brewer. Ryan Dean was found lying on the couch and did have blood on his hands, but was not in need of medical attention. The officers observed beer cans, some empty and some half full, and could smell alcohol on all the minors. The Hamburg officers administered a breath test on the minors and issued tickets for minor in possession of alcohol. Brewer's minor in possession case was dismissed after the state court ruled that the officers' entry into the Hardesty home was illegal. After that ruling, the charges against Joseph Hardesty were dismissed as well.

Joseph Hardesty and his father filed a § 1983 suit in federal district court against the five officers who entered the Hardesty home, Sergeant Debottis who instructed the Hamburg officers to enter the house, Hamburg Township, the Hamburg Police Chief, the Supervisor of Hamburg, two Hamburg trustees, the village of Pinckney, and the Pinckney Police Chief. All of the Hardestys' claims are based on the allegation that the officers' warrantless search of the Hardesty residence was unconstitutional. Plaintiffs and Defendants filed cross-motions for summary judgment. The district court ruled that the state court decision regarding the legality of the search was not binding, the officers' actions were constitutional, and that even if they were not constitutional, qualified immunity immunized the officers from suit. Consequently, the district court granted Defendants' motions and dismissed all claims. Plaintiffs filed a timely appeal.

---

[1]The officers also testified that they rang the doorbell, but Kenneth Hardesty testified that the residence does not have a doorbell.

## II. ANALYSIS

### A.    Standard of Review

This court reviews an order granting summary judgment de novo. *Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005); *Daniels v. Woodside*, 396 F.3d 730, 734 (6th Cir. 2005); *Valentine-Johnson v. Roche*, 386 F.3d 800, 807 (6th Cir. 2004). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *accord Johnson*, 398 F.3d at 873; *Daniels*, 396 F.3d at 734; *Leadbetter v. Gilley*, 385 F.3d 683, 689 (6th Cir. 2004). When deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Johnson*, 398 F.3d at 873; *Daniels*, 396 F.3d at 734; *Valentine-Johnson*, 386 F.3d at 807. Any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true. *Muhammad v. Close*, 379 F.3d 413, 416 (6th Cir. 2004). Nevertheless, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *accord Leadbetter*, 385 F.3d at 689-90; *Weaver v. Shadoan*, 340 F.3d 398, 405 (6th Cir. 2003).

### B.    Preclusive Effect of State Court Judgment

Plaintiff Joseph Hardesty was charged with being a minor in possession of alcohol in state court. The state court granted his motion to suppress and dismissed the charge on the basis that the police officers' entrance onto the back deck of the Hardesty home was a constitutionally impermissible warrantless search. The state court reasoned that since the perceived medical emergency was not observed by the officers until after they entered the curtilage of the home, i.e., the back deck, what they saw while they were impermissibly within the curtilage could not be used to justify the entry into the home itself. The federal district court below held that it was not bound by the state court decision on the legality of the search because neither the defendants nor Plaintiff Kenneth Hardesty were parties to the state court litigation. On appeal, Joseph Hardesty argues that at least he is entitled to preclude the defendants from taking a position contrary to the ruling of the state court.

Federal courts give the same preclusive effect to state court judgments as those judgments would receive in the courts of the rendering state. *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984). "Under Michigan law, issue preclusion applies when 1) there is identity of parties across the proceedings, 2) there was a valid, final judgment in the first proceeding, 3) the same issue was actually litigated and necessarily determined in the first proceeding, and 4) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the earlier proceeding." *Darrah v. City of Oak Park*, 255 F.3d 301, 311 (6th Cir. 2001) (citing *People v. Gates*, 452 N.W.2d 627, 630-31 (Mich.)). The first element is met when the litigants were parties to a prior action or were privy to parties to a prior action. *Id*. None of the defendants were parties to the state court prosecution. Plaintiffs argue that Defendants were in privity with the State of Michigan which prosecuted the minor-in-possession case. Plaintiffs cite a footnote in an Eighth Circuit case which indicates this argument would be valid under North Dakota claim preclusion law. *See Patzner v. Burkett*, 779 F.2d 1363, 1369 n.7 (8th Cir. 1985). However, the cases applying Michigan law have all held that police officer defendants in a § 1983 case are not in privity with the prosecution of a related criminal case and do not have a personal stake in the outcome of the criminal case. *See Von Herbert v. City of St. Clair Shores*, 61 Fed. Appx. 133, 136 n.1 (6th Cir. 2003) (unpublished); *Burda Brothers, Inc. v. Walsh*, 22 Fed. Appx. 423, 430 (6th Cir. 2001)

(unpublished); *Kegler v. City of Livonia*, 1999 WL 133110, at \*2 n.2 (6th Cir. 1999) (unpublished); *Glass v. Abbo*, 284 F. Supp. 2d 700, 705-06 (E.D. Mich. 2003). Therefore, collateral estoppel cannot be used offensively to preclude the litigation of an issue addressed in an associated criminal case. In light of this line of persuasive authority, the district court did not err in coming to the same conclusion in this case.

## C.    Hamburg Defendants

Plaintiffs' § 1983 case against the Hamburg Defendants is based on the contention that the Hamburg officers violated the Fourth Amendment when they went onto the back deck of the Hardesty home and entered the home without a search warrant. The Fourth Amendment provides that individuals shall be free from warrantless unreasonable searches and seizures in their "persons, houses, papers, and effects." U.S. Const. Amend. IV. There are only a few exceptions to the rule that the government must obtain a warrant supported by probable cause to intrude into a private dwelling. *Thompson v. Louisiana*, 469 U.S. 17, 19-20 (1984). These exceptions to the Fourth Amendment prohibition exist where the public interest requires there be a more flexible application of the rule. *Arkansas v. Sanders*, 442 U.S. 753, 759, (1979). Two of these exceptions are voluntary consent to search and exigent circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *Michigan v. Tyler*, 436 U.S. 499, 509 (1978). Exigent circumstances include a Fourth Amendment warrant exception where law enforcement faces a "need to protect or preserve life or avoid serious injury." *Mincey v. Arizona*, 437 U.S. 385, 392-93 (1978). The Supreme Court has extended Fourth Amendment protections to the curtilage around a house. *Oliver v. United States*, 466 U.S. 170, 180 (1984). Curtilage is the land surrounding and associated with the home which "harbors the intimate activity associated with the sanctity of a man's home and the privacies of life." *United States v. Dunn*, 480 U.S. 294, 300 (1987) (internal quotation omitted).

### 1.    Curtilage

The only basis the Hamburg officers assert for entering the Hardesty home without consent or a warrant was their observation of a young man lying on a couch with blood on his hands and pants, apparently not breathing, and unresponsive to loud noises and bright lights. The officers did not make this observation until they left the front door, went around to the back of the house, went onto the back deck, and peered in the windows and door at the back of the house. Plaintiffs argue that the officers' presence on the back deck without a warrant or legitimate basis for a warrantless search was a violation of the Fourth Amendment because the back deck is part of the home's curtilage. The district court held that the back deck of the Hardesty home is not part of the home's curtilage.

The Supreme Court has set forth four factors to be used to determine whether an area is part of a home's curtilage. *United States v. Dunn*, 480 U.S. 294, 301 (1987). The four factors are "[1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by." *Id*. These factors are not to be applied mechanically, but are simply "useful analytical tools" to consider the central question of "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.*

Since the back deck directly abuts the house, the first factor of proximity to the home clearly weighs in favor of finding the back deck to be within the home's curtilage. The second factor is somewhat less clear. While there is no fence enclosing the Hardesty yard or property, there is a line of pine trees along the back of the property and the sides of the property appear to be bounded by trees as well. There is also a railing around the deck itself. The third factor weighs in favor of finding the back deck to be curtilage. There was a hot tub built into the deck and the Hardestys

frequently kept a grill and table out on the porch as well. The Sixth Circuit has held the presence of pruned trees, a picnic table, and firepit to be sufficient to indicate that an area was "used for the activities and privacies of domestic life." *Widgren v. Maple Grove Township*, 429 F.3d 575, 582 (6th Cir. 2005). The presence of space for gardening and hanging laundry out to dry has also been found to weigh in favor of finding an area to be curtilage. *United States v. Jenkins* 124 F.3d 768, 773 (6th Cir. 1997). Like gardening and doing laundry, using a hot tub is an activity which is associated with the activities and privacies of domestic life. The fourth factor also weighs in favor of finding the back deck to be curtilage. The placement of the deck directly behind the house protects the deck from being visible to people passing by. *See Jenkins*, 124 F.3d at 773 (observing that the placement of the back yard behind the house naturally protected it from the view of passers by on the only public road adjoining the property). The testimony in the record that neighbors could see the back deck through the rows of pine trees along the back of the Hardestys' yard does not undermine this conclusion. An area can be curtilage even where neighbors have a view of the area. *See Daughenbaugh v. Tiffin*, 150 F.3d 594, 600-01 (6th cir. 1998) (holding that a home's backyard was curtilage in spite of evidence that neighbors could see at least a portion of the yard).

Consideration of the *Dunn* factors indicates that the Hardestys' back deck is part of the home's curtilage. This conclusion is further supported by the line of Sixth Circuit cases holding that the backyard of a home is part of the curtilage. *Widgren*, 429 F.3d at 582; *Daughenbaugh*, 150 F.3d at 601 ("The backyard and area immediately surrounding the home are really extensions of the dwelling itself."); *Jenkins*, 124 F.3d at 773. This is the case even where a yard is not surrounded by a fence. *See Widgren*, 429 F.3d at 582. There is nothing about the Hardestys' backyard which distinguishes it from any of the backyards the Sixth Circuit has held to be curtilage. Since the case law compels the conclusion that the Hardestys' backyard is part of the home's curtilage, the back deck–which is located within the backyard and is even more closely associated with the activities of the home–must logically be within the curtilage as well. The district court's conclusion to the contrary was error.

### 2.      *Knock and Talk*

Defendants argue that even if the back deck was part of the home's curtilage, the Hamburg officers did not violate the Fourth Amendment when they went onto the deck in order to knock at the back door after nobody answered at the front door. Plaintiffs acknowledge that the officers were permitted to go to the front door to knock for purposes of speaking with the occupants or asking for consent to search the premises. *See, e.g., United States v. Thomas*, 430 F.3d 274, 277 (6th Cir. 2005); *United States v. Chambers*, 395 F.3d 563, 568 n.2 (6th Cir. 2005); *Ewolski v. City of Brunswick*, 287 F.3d 492, 504-05 (6th Cir. 2002). However, Plaintiffs assert that this principle did not authorize the officers to proceed to the back door.

Defendants contend that the same legal principle which permits officers to employ the knock and talk investigative technique at the front door also justifies the decision to go to the back door under the circumstances of this case. Defendants point out that they had reason to believe someone was home due to the presence of multiple cars in the driveway and the fact that an interior light had been extinguished as the officers proceeded up the driveway. Therefore, they argue that when there was no answer at the front door, they were permitted to go around to the back of the house to look for another way of attempting to contact the individuals present in the house. This circuit has recognized the legitimacy of the knock and talk investigative technique in general, but has not previously had occasion to consider whether the principle may be extended beyond the front door to an inquiry at the back door.

The Third, Fourth, Eighth, and Ninth Circuits have all been faced with situations where police officers knocked on a front door and, upon not receiving an answer, proceeded to the back door. *Estate of Smith v. Marasco*, 318 F.3d 497, 520-21 (3d Cir. 2003); *United States v. Bradshaw*,

490 F.2d 1097, 1100 (4th Cir. 1974); *United States v. Anderson*, 552 F.2d 1296, 1300 (8th Cir. 1977); *United States v. Hammett*, 236 F.3d 1054, 1060 (9th Cir. 2001). All of these circuits held that a knock and talk can be extended to the back door or backyard under certain circumstances. The Ninth Circuit has stated that "an officer may, in good faith, move away from the front door when seeking to contact the occupants of a residence." *Hammett*, 236 F.3d at 1060. The Fourth Circuit has held that "the Fourth Amendment does not prohibit police, attempting to speak with a homeowner, from entering the backyard when circumstances indicate they might find him there." *Alvarez v. Montgomery County*, 147 F.3d 354, 356 (4th Cir. 1998). The Third Circuit has held that "[w]here officers are pursuing a lawful objective, unconnected to any search for the fruits and instrumentalities of criminal activity, their entry into the curtilage after not receiving an answer at the front door might be reasonable as entry into the curtilage may provide the only practicable way of attempting to contact the resident." *Marasco*, 318 F.3d at 520.

We adopt an approach similar to those taken by our sister circuits and hold that the officers' decision to proceed around the house to seek out a back door was within the scope of the knock and talk investigative technique already recognized in this circuit. Police officers are permitted to enter private property and approach the front door in order to ask questions or ask for consent to search the premises. But knocking at the front door will not always result in police officers being able to initiate the permitted conversation. The most obvious example is where nobody is at home. Even where someone is at home, knocking at the front door may go unheard. When the circumstances indicate that someone is home and knocking at the front door proves insufficient to initiate a conversation with the person sought, officers should not be categorically prevented from carrying out their investigative function. Therefore, we hold that where knocking at the front door is unsuccessful in spite of indications that someone is in or around the house, an officer may take reasonable steps to speak with the person being sought out even where such steps require an intrusion into the curtilage. In this case, there were indications that someone was present within the Hardesty home, knocking at the front door proved unsuccessful, proceeding around the house and onto the back deck was a reasonable step, and that step was directed towards initiating a conversation with the person or persons in the house. Therefore, the Hamburg officers' entry into the curtilage in order to effectuate the knock and talk investigative technique did not violate Plaintiffs' Fourth Amendment rights.

### 3. Medical Emergency

The three officers who went to the back door all testified that once on the back deck they observed a young man lying on a couch inside the house whose hands and pants were bloody and who appeared to not be breathing. They all testified that they beat on the door and side of the house, shined their flashlights in the young man's eyes, and shouted, but nothing roused him. Plaintiffs offered testimony that the only window along the back of the house from which the couch could be seen was covered with closed draperies. Therefore, they argue that the officers could not have seen what they claim through the closed draperies and are lying to create a justification for their warrantless entry into the Hardesty home. The district court pointed out that even according to Plaintiffs' testimony it would have been possible for the officers to see whether a person was lying on the couch through the closed drapes, even though they would not necessarily have been able to tell that the person was a young man or been able to see blood on his hands and pants. The district court then concluded that, in the context of this case, the presence of a person on a couch not responding to lights shining in his eyes and loud shouting and banging was sufficient to give the officers a reasonable belief that a medical emergency existed.

The Supreme Court has recognized that the warrant requirement of the Fourth Amendment does not necessarily apply to police responding to emergency situations. *Mincey v. Arizona*, 437 U.S. 385, 392 (1978) (observing that "[n]umerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when

they reasonably believe that a person within is in need of immediate aid"); *see also Thacker v. City of Columbus*, 328 F.2d 244, 253 (6th Cir. 2003). Such a scenario falls within the exigent circumstances exception to the warrant requirement. *See United States v. Williams*, 354 F.3d 497, 503 (6th Cir. 2003). The government bears the burden of proving that exigent circumstances such as a medical emergency existed to justify a warrantless search. *United States v. Bates*, 84 F.3d 790, 794 (6th Cir. 1996).

There were three officers who went to the back door of the Hardesty home, Officers Bullock, Sanderson and Garbarcik. Bullock testified that once on the back deck they looked through the sliding glass door and windows to see if they could see anyone inside the house. He stated that he saw a very young man lying on the couch with blood on his hands and pants who appeared to not be breathing. Bullock went on to describe how he and the other officers pounded on the window and shined their lights in the young man's face to see if he was okay, but received no response. Bullock also testified that they saw empty beer cans and cartons in the house, including one or two cans on the coffee table in front of the individual on the couch. Sanderson gave essentially the same description of what he saw while looking through the window from the back deck and their efforts to rouse the individual seen on the couch. Garbarcik also testified to the same essential elements of what was seen in the house: empty beer cans and a non-responsive individual lying on a couch with some blood on his hand and pants who appeared to not be breathing.

Joseph Hardesty testified that earlier in the evening on the night in question he had closed the drapes covering the windows in the back of the house and had not subsequently re-opened them. Sanderson stated that there were no drapes or other window treatments covering the window when he looked inside and saw the person on the couch. Bullock stated that he could see through the window and did not recall any drapes or anything else covering the window. The foregoing testimony demonstrates that there is a genuine issue of fact concerning whether drapes were covering the window from which the couch could be viewed.

Defendants do not dispute that there is an issue of fact about the drapes being open or closed. Instead, they argue that this fact is not material because even if the drapes were closed they could still have seen enough through the closed drapes to give them a reasonable belief that there was a medical emergency. Kenneth Hardesty testified that even with the drapes closed "[y]ou would be able to observe if you were within four or five foot of that window a individual on the couch. You would not be able to tell if it was a man or a woman. You would just be able to see a form on the couch." (JA 225-26.) He went on to state that from that position a person could not really distinguish colors or see fine movements. Therefore, the facts taken in the light most favorable to Plaintiffs are that the drapes were closed, the officers could not see blood on the person lying on the couch, the officers could not determine whether the person lying on the couch was breathing, but the officers could see that there was an individual lying on the couch.

Even taking the facts in the light most favorable to Plaintiffs, there was a basis for the officers to reasonably believe a medical emergency existed. The reason for their visit to the Hardesty residence was a report that minors were consuming alcohol there that night. Upon arriving at the back door they saw a person lying on a couch who did not respond to loud knocking on the door and window or bright lights shining in his face. Given the known dangers of excessive alcohol consumption pointed out by the district court, under these circumstances the officers could have reasonably believed that the individual on the couch was suffering from alcohol poisoning. That reasonable belief was a sufficient basis for entering the Hardesty residence without a warrant or consent. Since the exigent circumstances exception to the warrant rule applied, the officers did not violate the Fourth Amendment when they entered the Hardesty home.

**D.      Pinckney Defendants**

Plaintiffs' § 1983 case against the Pinckney Defendants is based on the contention that the Pinckney officers violated the Fourth Amendment when they entered the Hardesty home without a search warrant.  The Pinckney officers arrived on the scene after the Hamburg officers had gone to the back door, looked into the windows, and determined that they needed to enter the house in order to see if medical assistance was required.  The Pinckney officers entered the house with the Hamburg officers based upon the information provided by the Hamburg officers that an individual in the house appeared unconscious and bleeding.  Reliance upon such information insulates the Pinckney officers from civil liability in the event the information relied upon was defective.  *See United States v. Hensley*, 469 U.S. 221, 230 (1985); *Whitely v. Warden*, 401 U.S. 560, 568 (1971); *Feathers v. Aey*, 319 F.3d 843, 851 (6th Cir. 2003).  Therefore, even if the Hamburg officers had violated the Fourth Amendment in the course of learning of the apparent emergency, the Pinckney officers' entry into the house based on that information would not subject the Pinckney officers to § 1983 liability.  Consequently, there is a separate and independent basis for affirming the grant of summary judgment in favor of the Pinckney Defendants.

## III.  CONCLUSION

The evidence taken in the light most favorable to Plaintiffs does not establish a constitutional violation.  Therefore, all Defendants are entitled to judgment as a matter of law in their favor.  The order of the district court dismissing all claims is AFFIRMED.

---

**DISSENT**

---

BOYCE F. MARTIN, JR., Circuit Judge, dissenting. After careful consideration of the issues in this case, I must respectfully dissent from the majority's opinion. The district court's dismissal of the Hardestys' claims at the summary judgment stage was in error and should be reversed.

I.

The majority opinion omits a few important facts regarding the timing of events on that fateful night at the Hardesty house. Julie Taylor was arrested at 2:11 a.m. for drunk driving. Upon learning that she had consumed the alcohol at the Hardesty residence, the police chose to not go to the house and immediately enter but merely put the residence under observation. They observed the house for over two hours, until, at approximately 4:30 a.m., the officers decided it was an appropriate time to approach the house and ask the occupants some questions. After knocking on the door and, according to the officers' testimony, ringing a doorbell (which in fact does not exist), the officers decided to walk around the house to see if they could rouse the occupants from the back of the house.

To be clear, the officers had no warrant to enter the house or search the premises. The officers acknowledge that there were no exigent circumstances justifying a search apparent from their visit to the front door. There was no indication that a crime was being committed inside the house or that there was any activity inside the house. Finally, the officers approached at 4:30 a.m. after observing the house for over two hours without any indication that a crime was being committed in the house.

II.

With these facts in mind, I will now address the review of the summary judgment in favor of the defendants in this case. The section 1983 case stems from a Fourth Amendment violation against the Hardestys when the officers entered the back of their home without a warrant or a legitimate basis. Their claim relies on the recognition that their backyard and, specifically, the deck of the house is part in parcel of the home and subject to Fourth Amendment protection. Areas that lie beyond the physical walls of a home but which remain under its protection are referred to as curtilage.

"The curtilage concept originated at common law to extend to the area immediately surrounding a dwelling house the same protection under the law of burglary as was afforded the house itself." *United States v. Dunn*, 480 U.S. 294, 300 (1987). Blackstone explained the rationale behind curtilage as follows: "if the barn, stable, or warehouse, be parcel of the mansion-house, and within the same common fence, though not under the same roof or contiguous, a burglary may be committed therein; for the capital house *protects and privileges all its branches* and appurtenances, if within the curtilage or homestall." 4 W. Blackstone, Commentaries 225 (emphasis added). In *Dunn*, the Supreme Court laid out a four factor test for defining curtilage: 1) proximity of the area to the home, 2) whether the area is included within the enclosure which surrounds the home, 3) the nature of the uses of the area, and 4) the steps taken by the resident to prevent the area from being seen by people passing by. *Dunn*, 480 U.S. at 301. While I disagree with the majority in its

characterization of the second factor[1], I agree with its eventual result, finding this area to be within the curtilage of the home.

Despite finding the backyard and deck of the Hardesty house to be within the curtilage of the home, the majority holds that the officers' actions were excused by the "knock and talk" rule.

> Courts have defined [knock and talk] as a noncustodial procedure [in which] the officer identifies himself and asks to talk to the home occupant and then eventually requests permission to search the residence. Courts generally have upheld this investigative procedure as a legitimate effort to obtain a suspect's consent to search.

*United States v. Chambers*, 395 F.3d 563, 568 n.2 (6th Cir. 2005) (internal quotation marks and citations omitted). This Court has also held that "[f]ederal courts have recognized the 'knock and talk' strategy as a reasonable investigative tool when officers seek to gain an occupant's consent to search or when officers reasonably suspect criminal activity." *Ewolski v. City of Brunswick*, 287 F.3d 492, 504-05 (6th Cir. 2002) (quoting *United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001), *cert. denied*, 534 U.S. 861 (2001)).

The majority states that the Hardestys have acknowledged that the officers were within their rights to approach the house. It is unclear from reading the Hardestys' brief that such a concession has been made. However, I would disagree with the majority opinion that the officers had a right to approach the house. I read this Court's precedent for the 'knock and talk' rule as requiring the officers' decision to knock and talk to be a reasonable one. In this case, the officers acted strangely and without a reasonable explanation in waiting outside the house for over two hours then, at 4:30 a.m., approached the house to supposedly obtain consent for a search. I fail to see how, in this instance, the knock and talk was used as a "reasonable investigative tool."

However, assuming that the original knock and talk was permissible, this does not immediately mean that the officers had the right to further invade the privacy and sanctity of the Hardesty home and walk into the backyard. The majority, creating new law for this Court, holds that a knock and talk situation permits officers, upon receiving no response, to continue to the back of the house to look for its occupants without a search warrant. This bold extension of the 'knock and talk' rule essentially extinguishes the protections afforded to curtilage. "[T]he capital house protects and privileges all its branches and appurtenances, if within the curtilage or homestall." 4 Bl. Comm. at 225. A violation of the curtilage of the home is the same as violating the home itself. *See Dunn*, 480 U.S. at 300. To allow officers effective access to the entire home merely based on non-responsiveness to a knock at the front door flies in the face of the historic privilege extended to curtilage. Could the officers have, upon receiving no response from a knock at the front door, attempted to open that door and then enter the home unannounced? If we are truly to treat a home's curtilage in the same manner and same protections afforded to the home itself, then a curtilage extension to the 'knock and talk' rule cannot be permitted under the Fourth Amendment.

The majority hangs this extension of the 'knock and talk' rule on the circumstance where "knocking at the front door is unsuccessful in spite of indications that someone is in or around the house, an officer may take reasonable steps to speak with the person being sought out even where such steps require an intrusion into the curtilage." Maj. Opn. at 6. The majority believes this rule is sufficient to protect a home from officers entering curtilage when no one is actually home. Practically, however, this "safeguard" can not work. In this case, the Hardestys claim that the lights which were turned on and off inside the home (which the officers relied on to indicate that someone

---

[1]The presence of a line of trees surrounding the entire backyard, along with a railing encircling the deck, make the second factor one which I believe strongly favors a finding that this area is curtilage.

was present) were on a timer. Beyond lights set on a timer, one could imagine a number of "indications that someone was home" which are false indications. Security systems often turn on and off the lights or turn on and off a radio or television to give potential burglars the illusion that a home is occupied. Timed sprinkler systems or lighting systems make it seem that they are being turned on by someone within the home. Televisions, radios, and alarm clocks accidentally left on could give the impression that someone is present. Finally, voices from within the home could stem from a phone answering system or a friendly parrot. While these examples range from the realistic to the absurd, the reality is that to rely on "indications that someone is in or around the house" to destroy the Fourth Amendment protections of a residence is unjustifiable.[2]

Even if the majority's extended 'knock and talk' rule is an appropriate one, I must question the decision in this case that the officers took "reasonable steps" when they entered the curtilage. I, again, must point out the more than two hours officers spent merely observing the Hardesty home. Then, at 4:30 a.m., the officers decided to approach, making their approach extremely remote in time to when they observed indications that someone was within the house. The time spent by the officers waiting outside the home was unreasonable. The time of the knock and talk, given the potential offenses in question, was unreasonable. Finally, the decision to enter the curtilage was unreasonable.

While the majority does not mention this, I believe it is also relevant to consider exactly what crimes the officers were investigating when these events took place. Julie Taylor, upon her arrest, told the police that she had been drinking alcohol at the Hardesty home with Joseph Hardesty, a minor. A first-time violation of Michigan's Minor in Possession statute is a $100 fine and no jail time. M.C.L. § 436.1703. The Minor in Possession statute covers both possession and consumption of alcohol by a minor. *Id.* The "[F]ourth [A]mendment prohibits the police from making a warrantless night entry of a person's home in order to arrest him for violation of a nonjailable traffic offense." *United States v. Morgan*, 743 F.2d 1158, 1161 (6th Cir. 1984) (citing *Welsch v. Wisconsin*, 466 U.S. 740, 748 n.10 (1984)). Yet here we have a warrantless entry of a person's home (treating the curtilage as equal to the home) at night to *question the residents* about an offense that carries with it no jail time. This Court has held that the Fourth Amendment prohibits such actions to make an arrest. Therefore, it is logical that the Fourth Amendment prohibits such actions being taken to merely question the occupants.

For these reasons, I would reverse the district court's granting of summary judgment and remand for further proceedings. Because I would reverse based on the officers' violation of the Fourth Amendment by entering the curtilage, I would find summary judgment inappropriate whether or not there were exigent circumstances to justifying entering the home.[3]

III.

For these reasons, I respectfully dissent from the majority's opinion.

---

[2] I would be remiss to not mention the classic holiday film HOME ALONE (1990), in my discussion of how a home might appear to be occupied. In the film an eight-year-old Macaulay Culkin is able to outwit passers-by, convincing them that he is not home alone by using radios, televisions, lights, and cardboard cutouts.

[3] I do wish to note, however, that the "blood on the hands" of the person lying on the couch was, in fact, scabs on the knuckles of the young man who needed no medical attention after the officers entered the Hardesty home. Because this case is at the summary judgment stage and, taking these facts in the light most favorable to the Hardestys, it is hard to believe that the officers saw those scabs and believed it to constitute an exigent circumstance.