# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### January 19, 2012 Session

## STATE OF TENNESSEE v. STONEY R. ANDERSON, II

**Appeal from the Circuit Court for Hickman County**
**No. 10-5076CR     James G. Martin, III, Judge**

---

### No. M2011-01766-CCA-R3-CD - Filed June 12,, 2012

---

The Defendant-Appellant, Stoney R. Anderson, II, pled guilty in the Hickman County Circuit Court to possession of more than half an ounce of marijuana with intent to sell, a Class E felony. He was sentenced as a Range I, standard offender to two years' probation. Pursuant to Rule 37(b)(2)(A) of the Tennessee Rules of Criminal Procedure, Anderson reserved the following certified question of law: "[w]hether the warrantless search of the Defendant's bag is supported by exigent circumstances." Upon review, we reverse and vacate the judgment of the trial court and dismiss the case.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Reversed and Case Dismissed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J., joined and JERRY L. SMITH, J., not participating.

Dale M. Quillen and Kenneth Quillen, Nashville, Tennessee, for the Defendant-Appellant, Stoney R. Anderson, II.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Kim R. Helper, District Attorney General; and Michael J. Fahey, II, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

**Background.** This case concerns a law enforcement officer's warrantless entry into Anderson's home and the subsequent search of a duffle bag Anderson was holding in his hands at the time. Inside the bag, officers discovered approximately one and a half pounds of marijuana and drug paraphernalia. Anderson filed a motion to suppress the evidence

obtained as a result of the search, arguing that the officers lacked a warrant or any other legal grounds to authorize the search.[1]

At the evidentiary hearing on the motion to suppress, Deputy Kyle Chessor of the Hickman County Sheriff's Department testified that at approximately 1 a.m. on September 26, 2009, he was dispatched to Wilder Point Road in response to a call reporting an "unknown disturbance with shots being fired." When Deputy Chessor arrived at Wilder Point Road, he met with Deputy Cohen. They parked their cars at the bottom of a steep hill on Wilder Point and proceeded on foot. As the deputies were walking, Deputy Chessor heard loud music coming from a house later determined to be Anderson's. He saw a car leave the house, and Deputy Chessor stopped the car. He talked with the people in the car, including Matthew Roberson, whom Deputy Chessor recognized as a personal acquaintance. They informed him that there had been no disturbance at the residence, and they were not aware of any gunshots or the presence of a firearm. They said that there was a "small get-together" at Anderson's house.

The deputies continued toward the house and saw a light inside. They walked to the back of the house. Deputy Chessor said they did not go to the front door because, "[w]ith disturbances like that we want to kind of approach from a different angle, whatever angle we think is the best. It differentiates from call to call. It's a safety concern." At the back of the house, the deputies climbed a staircase leading to a deck and a back door. While the deputies were on the deck and before they reached the back door, Anderson, who was carrying a duffle bag, exited the door and walked onto the deck.

Through the open door, Deputy Chessor testified that he smelled a "very strong odor of burnt marijuana" coming from inside the house. Deputy Chessor identified himself to Anderson and explained why he was there. Anderson told Deputy Chessor that he was having a "get-together" and that there had been no disturbance or gunshots. Deputy Chessor then walked to the door and saw several people inside the house at a kitchen table. He told Anderson that he "wanted to speak with everyone and make sure there wasn't a weapon involved anywhere and make sure there wasn't any kind of physical threat like that." Deputy Chessor ordered Anderson into the house, and Deputy Chessor followed him inside.

Once inside, Deputy Chessor told the other people gathered in the kitchen to put their hands on the table and that he was concerned that there might be a weapon in the house. He testified, "We were concerned about what was going on because our information was pretty limited from dispatch as to what was happening." Meanwhile, Anderson walked toward a bedroom, still carrying the duffle bag. Deputy Chessor, concerned Anderson was going to

---

[1]The suppression motion refers, apparently erroneously, to the search of Anderson's automobile rather than his house.

retrieve a weapon, told him to stop twice. Anderson ignored the commands and entered the bedroom. Deputy Chessor then "had to physically go tell him to stop," and Anderson complied.

At this point, Anderson told Deputy Chessor that he wanted to call his attorney, which Deputy Chessor allowed. Anderson called his attorney, advised him of the situation, and Deputy Chessor spoke with the attorney. Deputy Chessor advised the attorney that he was concerned that there was a "weapon in the residence, particularly in the duffle bag, the way [Anderson] was acting." Deputy Chessor testified that the attorney "suggest[ed] no search of the residence of any kind to be consented or anything like that, no search." Deputy Chessor told the attorney that he understood.

Following the telephone conversation with the attorney, Deputy Chessor asked Anderson "what was in the bag because [he] figur[ed] it was a weapon due to the nature of the call." In response to Deputy Chessor's questioning Anderson as to why someone would report "a gunshot fired," Anderson said that "he wasn't sure" and that it was possible that a "prior relationship" was to blame. Anderson further explained that he was under an order of protection and was not permitted to own or possess a firearm. Deputy Chessor told Anderson "that [he] wanted to check the bag just to make sure there wasn't a firearm there for safety [sic] sake." Deputy Chessor testified that Anderson "didn't agree [to the search], and [Anderson] further stated that his counsel didn't want a search of the residence made, and [Deputy Chessor] advised [Anderson], I'm not searching the residence, just the bag for the firearm."

Finally, Anderson said, "[Y]ou don't have to search [the bag], you know what's in there." Deputy Chessor asked if marijuana was in the bag, to which Anderson again responded, "[Y]ou know what's in there." When Deputy Chessor opened the bag, he found approximately one and a half pounds of marijuana, digital scales, sandwich baggies, and empty Crown Royal bags. He did not find a weapon in the bag or with any of the other people in the house.

On cross-examination, Deputy Chessor testified that he did not have either a search or arrest warrant for Anderson or his home. Although Deputy Chessor denied knowing Anderson's address prior to the instant offense, a notice of property seizure and two misdemeanor citations issued by Deputy Chessor to Anderson noting Anderson's address were admitted into evidence. When asked how he knew he had the "right residence" that night, Deputy Chessor explained, "We could hear loud music at the residence. I believe there was a mailbox there with it marked." Upon being shown a photograph of the mailboxes in front of Anderson's home, Deputy Chessor acknowledged that Anderson's mailbox was the second mailbox in a row of five mailboxes with only one numeric displayed for all five mailboxes. He further acknowledged that he parked "a good distance away" from

Anderson's home.  Finally, Deputy Chessor confirmed that the dispatch he received (1) did not identify the person who made the report or a possible suspect; and (2) did not state when the shots were fired or where the disturbance took place.

Matthew Roberson, who had been at Anderson's house on the night of the offense, testified that as he was leaving Anderson's house in his car, he saw police officers walking toward him on the road.  Deputy Chessor, whom Roberson had known since his childhood, approached the car and asked Roberson and Roberson's wife for identification.  Deputy Chessor asked what was happening at Anderson's house.  Roberson told Deputy Chessor that they had been at the house "having a barbeque out on the back deck listening to music, you know, just relaxing and having fun."  He told Deputy Chessor that he had been at the house for approximately two and a half to three hours and that he had not heard gunshots in the area.

Roberson testified that Anderson's house was located on a private drive shared by other houses.  All the houses' mailboxes were located at the beginning of the private drive.  Roberson identified photographs of Anderson's house, which were admitted as exhibits at the hearing.  One photograph, taken from the road at an angle to the front of the house, depicts the front and side of the house, the front yard, and a gravel and dirt parking area on the side of the house.  The house is mostly surrounded by trees, and no other houses are visible in the photograph.  The backyard cannot be seen.  Another photograph depicts the rear of the house, including a two-tiered deck attached to the house, a back door, and what Roberson called the "pool area."  Stairs lead up to the deck from the yard, and close to the top of the stairs is a door to the house.  At the foot of the stairs are a number of children's toys.  On the back deck are more toys, a grill, and several coolers.  Roberson testified that the rear of Anderson's house appeared this way on the night of the offense.

Justina Hollers, Anderson's girlfriend, testified that she had been at his house all day and night before the deputies arrived.  She was not aware of any disturbance and had not heard any gunshots. A number of friends and relatives were at the house. Hollers was in the kitchen when the deputies entered the back door and told them all to put their hands on the kitchen counter.  The deputies searched everyone.

Following the hearing, the trial court denied the motion to suppress and found that exigent circumstances supported the deputies' actions.  It stated:

> The Court finds that under the facts and circumstances of this case that this was a warrantless search that was authorized . . . .
>
> [The deputies] received a dispatch that is undisputed.  The dispatch said that there's a disturbance, possible shots had been fired.  The way that they

-4-

approached the residence, in the Court's mind, was entirely reasonable. It's 1:00 o'clock [sic] in the morning. They don't know what they're going to find. So they approach on foot so as to not alert or alarm someone. They approach cautiously. They go to the back of the residence so they can see where the light is coming from, and even before they get to the door and announce their presence, Mr. Anderson exits, and when he does then a strong odor of marijuana comes out with him.

They go inside, . . . and they gain control of the inside of the residence. They ask everyone to place their hands where they can be viewed, which is completely reasonable. They conduct a pat search of everyone in there to make sure that no one in there is armed. That's completely reasonable.

Everyone cooperates with the exception of Mr. Anderson, and he is asked to stay where you are three different times and he doesn't do that. In addition to that, the search that's involved here is limited to the duffle bag which is in the physical possession of Mr. Anderson, and has been in the physical possession of Mr. Anderson since he was first encountered on the deck, and it's the officers [sic] concern that that duffle bag may very well contain a weapon, and they would have been foolish not to search that duffle bag and turn their back on Mr. Anderson and leave or to place anyone else in potential harm.

. . . .

The actual physical search that's at issue here is of a duffle bag in the hand of Mr. Anderson, and under these circumstances the Court simply believes that this search was reasonable and it's authorized by our Constitution . . . .

Anderson later pled guilty, properly reserving for appeal a certified question of law: "Whether the warrantless search of the Defendant's bag is supported by exigent circumstances."

## ANALYSIS

Anderson claims that the trial court erred in denying his motion to suppress. He asserts that exigent circumstances did not support the search of Anderson's duffle bag. Even if there were exigent circumstances, according to Anderson, they cannot support the search because the deputies created them when they unconstitutionally intruded on the curtilage of Anderson's home. The State responds that "Deputy Chessor encountered circumstances leading to the objectively reasonable belief that there could be a serious risk to his safety,"

an exigent circumstance that justified the search of Anderson's bag. The State does not address whether the deputies created the exigency.[2] We agree with Anderson.

**Standard of Review.** The standard of review applicable to suppression issues involves a mixed question of law and fact. State v. Garcia, 123 S.W.3d 335, 342 (Tenn. 2003). "[A] trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." State v. Cox, 171 S.W.3d 174, 178 (Tenn. 2005) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). The Tennessee Supreme Court explained this standard in State v. Odom:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence.

928 S.W.2d at 23. Nevertheless, "the burden remains on the State to prove that a warrantless search was constitutionally permissible." State v. Richards, 286 S.W.3d 873, 877 (Tenn. 2009) (citing State v. Nicholson, 188 S.W.3d 649, 656-57 (Tenn. 2006); State v. Henning, 975 S.W.2d 290, 298 (Tenn. 1998)). A trial court's conclusions of law are reviewed de novo. State v. Carter, 160 S.W.3d 526, 531 (Tenn. 2005) (citing State v. Daniel, 12 S.W.3d 420, 423 (Tenn. 2000)).

As an initial matter, the record shows that the trial court filed two written orders denying the motion to suppress in addition to its oral order. The first written order, filed before Anderson pled guilty, included a discussion of the court's findings and analysis. The second written order, filed after Anderson filed notice of appeal, stated that "[t]he legal and factual bases for the denial are set forth on the record" of the suppression hearing. We glean from the transcript of the plea hearing that the parties agreed the first written order was in conflict with the court's oral order denying the motion to suppress. The parties requested the trial court enter a second order deferring to the court's oral order at the suppression hearing. However, the trial court did not have jurisdiction to file the second order because it did so after Anderson had already filed notice of appeal. State v. Pendergrass, 937 S.W.2d 834, 837 (Tenn. 1996) ("The jurisdiction of the Court of Criminal Appeals attaches upon the filing of

_____

[2]The State construes the certified question too narrowly and argues that we need not consider whether the deputies created the exigent circumstances or otherwise acted unreasonably. However, as we discuss below, exigent circumstances can support a warrantless search only when the police have not first violated constitutional protections. In order to answer the certified question, we must therefore consider the reasonableness of the deputies' actions prior to the search.

-6-

the notice of appeal and, therefore, the trial court loses jurisdiction.") (citing State v. Peak, 823 S.W.2d 228, 229 (Tenn. Crim. App. 1991)).  Nevertheless, we conclude that any variance in the findings between the oral order and the first written order are immaterial to our analysis here, and we rely on the court's more thorough oral order recorded in the suppression hearing transcript.  Cf. Alsip v. Johnson City Med. Ctr., 197 S.W.3d 722, 725 n.2 (Tenn. 2006) (relying on the more precise written order when the trial court's written and oral discovery orders differed).

I.  **Warrantless Search.**  Both the United States Constitution and the Tennessee Constitution protect against unreasonable searches and seizures.  U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."); Tenn. Const. art. I, § 7 ("That the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures . . . .").  "[A] warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement."  State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997) (citing Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971); State v. Bartram, 925 S.W.2d 227, 229-30 (Tenn. 1996)).  One such exception to the warrant requirement allows police to conduct a search or seizure in the presence of exigent circumstances.  State v. Meeks, 262 S.W.3d 710, 723 (Tenn. 2008).

Exigent circumstances commonly support a warrantless search when officers act "(1) [to continue] hot pursuit, (2) to thwart escape, (3) to prevent the imminent destruction of evidence, (4) [to respond] to an immediate risk of serious harm to police or others, and (5) to render emergency aid to an injured person or to protect a person from imminent injury."  Id.  The Tennessee Supreme Court has summarized the principles governing the determination of whether circumstances are sufficiently exigent to dispense with the warrant requirement:

> Exigent circumstances are those in which the urgent need for immediate action becomes too compelling to impose upon governmental actors the attendant delay that accompanies obtaining a warrant.  Thus, in assessing the constitutionality of a warrantless search, the inquiry is whether the circumstances give rise to an objectively reasonable belief that there was a compelling need to act and insufficient time to obtain a warrant.  The exigency of the circumstances is evaluated based upon the totality of the circumstances known to the governmental actor at the time of the entry.  Mere speculation is inadequate; rather, the State must rely upon specific and articulable facts and the reasonable inferences drawn from them.  The circumstances are viewed from an objective perspective; the governmental actor's subjective intent is

-7-

irrelevant. The manner and the scope of the search must be reasonably attuned to the exigent circumstances that justified the warrantless search, or the search will exceed the bounds authorized by exigency alone. Where the asserted ground of exigency is risk to the safety of the officers or others, the governmental actors must have an objectively reasonable basis for concluding that there is an immediate need to act to protect themselves and others from serious harm.

Id. at 723-24 (footnotes omitted).

However, the exigent circumstances exception does not apply if the police themselves impermissibly create the exigent circumstances. Kentucky v. King, 131 S. Ct. 1849, 1857-58 (2011); Carter, 160 S.W.3d at 532.[3] Police conduct leading up to a warrantless search, even if based on exigent circumstances, must be reasonable. King, 131 S. Ct. at 1858. Therefore, when the police "gain entry to premises by means of an actual or threatened violation of the Fourth Amendment," exigent circumstances cannot support the warrantless search. Id. at 1862.

Here, exigent circumstances did not support the warrantless search of Anderson's bag. Even if we were to accept the State's argument that the deputies reasonably feared that Anderson posed an immediate risk to their safety at the time they searched the bag, any risk to their safety arose only after they violated Anderson's constitutional protections by intruding on his back deck. The United States Supreme Court has stated that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." United States v. U.S. Dist. Court, 407 U.S. 297, 313 (1972). Additionally, the curtilage surrounding the house merits the same constitutional protection as the home. State v. Prier, 725 S.W.2d 667, 671 (Tenn. 1987). The extent of the curtilage, and thereby the extent of constitutional protection, is measured according to two similar tests under the United States and Tennessee Constitutions. Under the Fourth Amendment of the United States Constitution, a court determines "whether the area in question is so intimately tied to the home itself" to warrant protection by considering four factors:

[(1)] the proximity of the area claimed to be curtilage to the home, [(2)] whether the area is included within an enclosure surrounding the home, [(3)]

_____

[3]Although Carter recognizes and applies the police-created exigency doctrine, its specific holding on this issue, at least for the purposes of interpreting the Fourth Amendment, is abrogated by King. Compare King, 131 S. Ct. at 1863 (holding that police did not create exigent circumstances by knocking on a front door and announcing their presence), with Carter, 160 S.W.3d at 532 (holding that police "created exigent circumstances by approaching the defendants' residence and alerting the defendants to the[ir] presence").

the nature of the uses to which the area is put, and [(4)] the steps taken by the resident to protect the area from observation by people passing by.

United States v. Dunn, 480 U.S. 294, 301 (1987). Although Tennessee courts have not adopted these Dunn factors, they similarly define the extent of the curtilage under article I, section 7 of the Tennessee Constitution as "'the area around the home to which the activity of home life extends.'" Prier, 725 S.W.2d at 670-71 (quoting Oliver v. United States, 466 U.S. 170, 182 n.12 (1984)).

Anderson's deck was plainly within the curtilage of his home for the purposes of both the Fourth Amendment and article I, section 7. Considering the Fourth Amendment test, the deck was immediately attached to the house, and a back door opened to it. Although the area was not included within an enclosure, it was largely surrounded by trees. A grill was on the deck, indicating that Anderson used the area for cooking. The many toys indicate that young children used the area to play. Roberson's testimony indicates that Anderson used the area to relax and entertain guests. Additionally, the area was behind the house and not visible to passers-by on the road. All these factors support the conclusion that the deck was intimately tied to the home, and the deck, therefore, is protected under the Fourth Amendment. Cf. Hardesty v. Hamburg Twp., 461 F.3d 646, 652 (6th Cir. 2006) (finding rear deck to be protected curtilage under similar facts). Furthermore, this same evidence, particularly the nature of the activities that occurred on the deck, demonstrates that the deck was an area to which the activity of home life extended. Consequently, Anderson also enjoyed the protection of article I, section 7 of the Tennessee Constitution while on his deck. Because the deputies intruded on this constitutionally protected area without a warrant, they violated the mandates of the United States and Tennessee Constitutions.

Although the State on appeal offers no defense of the deputies' initial intrusion onto the deck, the trial court found the deputies' actions to be reasonable under the circumstances. Presumably, the trial court relied on the late hour and Deputy Chessor's testimony that the deputies, because of the nature of the dispatch, went to the back of the house out of a concern for their own safety. Considering the facts known to the deputies at the time, we conclude that this concern did not rise to the level of exigent circumstances sufficient to justify the warrantless intrusion on Anderson's deck. Rather, any fear the officers may have held was mere speculation. The deputies' basis for their fear, the dispatch related to a disturbance with gunshots fired, came from an unidentified informant whose reliability was not established. See State v. Simpson, 968 S.W.2d 776, 781 (Tenn. 1998) (assessing informant's reliability by considering credibility and basis of knowledge when a tip provides officers with reasonable suspicion). Additionally, the officers had no information linking Anderson or his house to the disturbance. In fact, Deputy Chessor testified at the hearing that his "information was pretty limited from dispatch as to what was happening," and he received information at the scene from Roberson, an identified acquaintance of Deputy Chessor's who

was leaving Anderson's house, that no disturbance or gunshots had occurred. As a result, we conclude that the trial court erred in denying Anderson's motion to suppress.

By so holding, we do not create a broad rule that an officer may never approach the back door of a house before first approaching the front door. Such an action may be reasonable under other circumstances. See, e.g., Brigham City v. Stuart, 547 U.S. 398, 406-07 (2006) (noting that knocking on the front door would have been futile and holding that officers did not violate the Fourth Amendment by entering back door when a fight was underway inside). Under the circumstances of this case, however, the constitutionally reasonable course of conduct would have been to approach the front door instead of approaching the back of Anderson's house. See State v. Harris, 919 S.W.2d 619, 623-24 (Tenn. Crim. App. 1995) (explaining that police, as members of the public, are impliedly invited to the front door of a residence).

The evidence used to convict Anderson was obtained as a result of the deputies' violation of Anderson's rights under both the United States and Tennessee Constitutions, and it therefore must be suppressed. Mapp v. Ohio, 367 U.S. 643, 654-55 (1961); Ellis v. State, 211 Tenn. 321, 327 (1963). Since this question is dispositive, the case against Anderson is dismissed.

## CONCLUSION

Upon review, we reverse and vacate the judgment of the trial court and dismiss the case.

_____
CAMILLE R. McMULLEN, JUDGE

-10-