STATE of Tennessee, Appellee,

v.

Michael Steve PRIER, Appellant.

Supreme Court of Tennessee,
at Nashville.

Feb. 16, 1987.

Rogers N. Hays, Jerry W. Wallace, Wade, Forrester, Hays & Wallace, Pulaski, for appellant.

W.J. Michael Cody, Atty. Gen. & Reporter David M. Himmelreich, Deputy Advocate General, Nashville, for appellee.

FONES, Justice.

The trial judge sustained defendant's motion to suppress the evidence, consisting of marijuana seized in a warrantless entry into defendant's premises at the direction of a Tennessee Highway Patrol helicopter pilot who observed three separate patches of plants near defendant's house. Defendant insisted that all of the plants were within the curtilage and the trial judge reluctantly agreed. The Court of Criminal Appeals, in a two-one decision, reversed without discussing the issue of whether the plants seized were located within the curtilage and entitled to the same Fourth Amendment protection as the house. We reverse the Court of Criminal Appeals and affirm the trial judge but remand for further proceedings because only the evidence obtained as a result of the warrantless entry into the premises by the officers on the ground may be lawfully suppressed.

It appears that defendant's house was located on the north side of Prospect Road, which ran east and west at that location. The house was approximately fifty yards from the public road. An unattached garage was located to the rear of the house and far enough west of the west side of the house to be visible from the public road. A driveway, shared with another house, located an unknown distance north of defendant's house, ran north from the public road to and past the west side of defendant's garage with a short spur drive into defendant's garage. A barn was directly behind the house and its east-west dimensions were greater than the width of the house, making it visible from the road on each side of the house. Neither the location nor the direction of the fencing in the backyard can be determined with accuracy. It appears that there are probably two unconnected lines of fence four to five feet in height made of barbed wire strung between wooden posts and partially covered with climbing vines. Apparently one fence line ran north from near the northeast corner of the house toward the barn. The other fence line apparently ran from the east side of the garage southeastwardly toward some point in the rear of the house.

Mike Dover, the helicopter pilot, testified that he was conducting a routine search of Giles County at the request of the Sheriff's Office and the Tennessee Alcohol Beverage Commission when he observed three patches of marijuana near a house on Pros-

pect Road. He testified that the first patch he spotted from the air was located directly behind the house, "probably fifty yards or so in a pasture that was grown up with ragweed and horse weeds." Dover testified there were dog pens at the barn where the marijuana was growing. When asked if that was not in the back yard of the house, he responded, "It was behind the house but I believe it was in a fenced off area that was also grown up. There was a lot of weeds around there." Dover acknowledged that there was a trail that went from the house to the dog pens but said, "I think you had to go through the barn to get to the marijuana that was there."

The second patch consisted of about ten plants, one of which was in a cut-out rubber basketball and the others in cans placed in a semi-circle on what was the right side of the house when it was seen from the front. Dover testified these plants were closest to the house, probably six or seven paces away. The moveable plants were next to the fence, but on the side away from the house. The State's witnesses described the area beyond the fence as a field grown up in weeds but acknowledged that all of the plants were within twenty to thirty feet of the house and that well-worn paths led from the house to the areas where the plants were located.

The third patch was located in a garden that was directly across the driveway from the house and forward of the detached garage, less than twenty-five yards from the rear left corner of the house. It was undisputed that defendant and his family cultivated tomatoes, okra and other vegetables in that garden; and his landlord testified at the preliminary hearing that the use of the garden plot was included in defendant's lease of the tract of land upon which the house, garage and barn were located. Defendant testified that he kept two dogs in the pens near the first patch of marijuana and used the barn to store furniture and wooden frames for chairs used in his upholstery business. Pear trees and a pond were to the right of the house where the second patch was found, and the defendant

stated that his children and dogs played in that area. Defendant further testified that the areas embracing all three patches of marijuana were in regular and frequent use by the family.

At the conclusion of the hearing on the motion to suppress, the trial judge asked defense counsel for his contention as to how far away from the house the furthest marijuana plants were located. His response was twenty-five yards. The trial judge then asked the prosecuting attorney if that was correct; and he responded, "Pretty close." Thereafter the trial judge rendered his decision with a few brief comments that included a quote from *Oliver v. United States*, 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984), to the effect that there is no expectation of privacy "for activities conducted out of doors in fields, except in the area immediately surrounding the home." 104 S.Ct. at 1741. He noted that all three patches were within twenty-five yards of the house and that no person was observed in the vicinity. After expressing regret that he was required to suppress the evidence, he granted defendant's motion.

Although he did not expressly articulate a finding that all three patches of marijuana were located within the curtilage, we can reach no other conclusion but that his ruling was predicated on that factual determination.

■ In the trial court the State made no response to defendant's position that the three patches of marijuana were located within the curtilage. Instead, the State emphasized the proximity of the three patches to the house and insisted that those facts created exigent circumstances. The State argued that some of the plants were mobile and that "someone could go out, grab it up, take it somewhere else, bring it in the house or whatever." The proof is undisputed that neither defendant nor his wife nor any other person was observed on the premises at any time relevant to the sighting by Dover or the entry and search by the officers on the ground. The State cited no authority and we are unaware of

any to the effect that proximity of marijuana plants to the house, in and of itself, gives rise to exigent circumstances. We think the only issue raised by the facts of this case is whether the patches of marijuana were within or without the curtilage and, if they were within the curtilage, whether it was necessary to obtain a search warrant before entering the premises and seizing the marijuana.

In *State v. Jennette*, 706 S.W.2d 614, 620 (Tenn.1986), there was no question that the marijuana involved was located within the curtilage and we expressly held that there was "no question but that the patches of marijuana were found in open fields."

In *Welch v. State*, 154 Tenn. 60, 64, 289 S.W. 510, 511 (1926), the curtilage was defined as "the space of ground adjoining the dwelling house, used in connection therewith in the conduct of family affairs and for carrying on domestic purposes."

In *Chico v. State*, 217 Tenn. 19, 394 S.W.2d 648 (1965), officers found stolen property in a honeysuckle thicket, thirty or forty yards from defendant's house and not within the enclosure surrounding the house. This Court said that there was no proof in the record that the honeysuckle thicket was used in the daily operations of the premises and held that:

> The law is settled that when the land on which the evidence is found is not possessed as a part of the curtilage or used in the daily operation of the premises, then the constitutional provision against unreasonable searches and seizures does not apply.

217 Tenn. at 25, 394 S.W.2d at 651.

In *State v. Lakin*, 588 S.W.2d 544 (Tenn. 1979), whether the seized marijuana was located in open fields or within the curtilage was one of the relevant issues. After finding no one at defendant's farm house, the officers conducting the search went to the barn approximately a quarter of a mile from the residence where they found a garden bounded by woods and a thicket. They followed a path from the garden and discovered a patch of marijuana about fifty feet away. After reviewing the Tennessee cases cited above and others, this Court held that the State had failed to show that the evidence preponderated against the finding of the Court of Criminal Appeals "that the area searched was not 'wild and wasteland' which might be 'roamed at will without a search warrant.'" 588 S.W.2d at 549.

In *Oliver v. United States, supra,* the United States Supreme Court reaffirmed the open fields doctrine of *Hester v. United States*, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924). Although there was no contention that the contraband involved was located within the curtilage, the Court discussed the rationale and the protection afforded the curtilage as follows:

> As Justice Holmes, writing for the Court, observed in *Hester*, 265 U.S., at 57, 44 S.Ct., at 446, the common law distinguished "open fields" from the "curtilage," the land immediately surrounding and associated with the home. See 4 Blackstone, Commentaries *225. The distinction implies that only the curtilage, not the neighboring open fields, warrants the Fourth Amendment protections that attach to the home. At common law, the curtilage is the area to which extends the intimate activity associated with the "sanctity of a man's home and the privacies of life," *Boyd v. United States*, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886), and therefore has been considered part of home itself for Fourth Amendment purposes. Thus, courts have extended Fourth Amendment protection to the curtilage; ....

104 S.Ct. at 1742.

In a subsequent footnote the Court made the following relevant comments with respect to the curtilage:

> The clarity of the open fields doctrine that we reaffirm today is not sacrificed, as the dissent suggests, by our recognition that the curtilage remains within the protections of the Fourth Amendment. Most of the many millions of acres that are "open fields" are not close to any structure and so not arguably within the curtilage. And, for most homes, the boundaries of the curtilage will be clearly marked; and the conception defining

the curtilage—as the area around the home to which the activity of home life extends—is a familiar one easily understood from our daily experience.

104 S.Ct. at 1743.

■ To make explicit what is unmistakably implicit in our cases and the federal cases, the curtilage is entitled to the same constitutional protection against ground entry and seizure as the home. Insofar as aerial search is concerned, the United States Supreme Court held in *California v. Ciraolo*, —— U.S. ——, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986), that the Fourth Amendment to the United States Constitution was not violated by the aerial observation, without a warrant, from an altitude of a thousand feet, of marijuana growing in a fenced-in back yard within the curtilage of defendant's home. The Court observed that the observations by the officers took place within public navigable air space in a physically non-intrusive manner and repeated the holding of *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), that what a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. We find that no greater protection is afforded by the Tennessee Constitution in these circumstances and adopt the holding of *California v. Ciraolo, supra.*

In this Court, the State asserts that the record supports a sighting and finding of a fourth patch of marijuana north of the barn, on the opposite side of the barn from the house, clearly in an open field and argues that the fact that the fourth patch was clearly in an open field renders irrelevant whether or not the other patches were within the curtilage. We have studied this record carefully and find no support for the State's assertion that a fourth patch of marijuana was located north of the barn. Apparently that notion was derived from Dover's somewhat confusing description of his sighting from the air of the marijuana plants "near the barn." But, the testimony of the three officers on the ground that seized the plants unequivocally establishes that there were only three patches of mari-

juana and that the one near the barn was between the dog pens and the barn on the same side of the barn as the house.

Ernest Thatcher, Jr., investigator for the Tennessee Alcoholic Beverage Commission testified at the preliminary hearing as follows:

"[a]t the direction of Mr. Dover, I went to the residence of Michael Steve Prier, located on the Prospect Road in Giles County, Tennessee. I went to two marijuana plants located about eighteen steps to the rear of the residence and to the right of the rear of a dog pen that contained two dogs. I observed as other officers went to two more patches near the premises. I cut the two plants down, brought them out of the area and observed in the backyard a water hose that appeared to be about the approximate distance to a garden across the drive. I observed another officer in this garden and stepped off this distance across the drive because there was a path very evident where it came from the yard, hit the drive, and went into the garden. It was approximately nineteen steps from the back corner of the house. I looked in the garden and the other officers brought the marijuana to me. I took composite samples from all three locations and separated them from the plants and submitted them to the T.B.I. Lab. On October 13, 1983, I requested and received an arrest warrant for Michael Prier."

The State introduced the lab report as an exhibit at the preliminary hearing and it reflects that the lab received for examination three exhibits, described as follows:

EXHIBITS:

#1. One envelope containing seven point six grams of plant material.

#2. One envelope containing one point six grams of plant material.

#3. One envelope containing three grams of plant material.

The lab report states that all three were identified as marijuana.

The other two officers that conducted the search on the ground testified at the preliminary hearing. Eugene Cathy of the TABC testified that he went directly to the

patch on the right hand side (east side) of the house and from there to the garden. Jack Blackman, another TABC officer, testified that Dover directed him to the marijuana "beside the house" and that from there he went to the patch in the garden. Thus, no officer on the ground, other than Thatcher, went to the patch near the barn.

We attach as an addendum to this opinion a diagram of the defendant's premises with the location of the three patches of marijuana, based upon our interpretation of the testimony and the pictures in this record.

■ We are of the opinion that the evidence preponderates in favor of the trial judge's finding that all three areas where marijuana were found were within the curtilage. This record establishes that the patch by the dog pen was not more than seventy-five feet from the house and the other two were closer. The barn was in regular use and at least two dogs were kept in the pens. That patch was within the boundary formed by the barn, the garage and the rear of the house. The second patch was on the side of the fence away from the house but was actually closer to the right rear of the house than the other two patches, and it does not appear that that fence line was attached to the house or the other fence so as to provide an enclosed area with the plants on the outside. Paths were said to lead from the house side of the fence to the marijuana plants on the opposite side, and there was undisputed testimony that the children and the dogs and the family played in that area. The plants in the garden were less than seventy-five feet from the house, across

level ground and the driveway, with no obstruction between the house and the garden. Again there was testimony that vegetables were cultivated and harvested in that garden. There was also evidence that the garden was screened from the view of travelers on Prospect Road by high brush and weeds. Thus there was undisputed testimony that all three areas were "used in the daily operation of the premises, in connection with the conduct of family affairs."

Because of the strength of the evidence that all three locations were within the curtilage and entitled to the protection of both the State and Federal Constitutions, we find it unnecessary to consider whether the term "possessions" in the State Constitution includes more than the curtilage and embraces the locations at issue here. *See e.g., Allison v. State,* 189 Tenn. 67, 222 S.W.2d 366 (1949); *Peters v. State,* 187 Tenn. 455, 215 S.W.2d 822 (1948); and *Welch v. State, supra.*

The result is that the judgment of the Court of Criminal Appeals is reversed and the trial court's ruling on defendant's motion is sustained to the extent that the testimony of the officers who entered defendant's premises with respect to what happened after entry and what material was seized is inadmissible. The testimony of Officer Dover remains unaffected by the motion. Remanded for further proceedings. Costs are adjudged against the State.

BROCK, C.J., and COOPER, HARBISON and DROWOTA, JJ., concur.

# APPENDIX

(Continues to an house & barn)

Barn

(?)

Dog Pen

Garage

House

(?)
(?)
(2)

(?)

③ Garden

driveway

High Bushes

Prospect Road

① location of first patch of Marijuana described in opinion

② location of second patch

③  "  "  third  "

x x x x  fence line

NOT TO SCALE

STATE V PRIER