IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 29, 2016

**STEVEN Q. STANFORD v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Campbell County**
**No. 15923     E. Shayne Sexton, Judge**

**No. E2015-00630-CCA-R3-PC – Filed July 19, 2016**

The Petitioner, Steven Q. Stanford, appeals the Campbell County Criminal Court's denial of his petition for post-conviction relief from his 2010 convictions for initiation of a process to manufacture methamphetamine and for misdemeanor possession of drug paraphernalia and from his effective fifteen-year sentence.  The Petitioner contends that he received the ineffective assistance of counsel because (1) counsel failed to file a motion to suppress evidence obtained during a search of the Petitioner's mother's property and (2) counsel failed to explain two plea offers adequately. Although we affirm the judgment of the post-conviction court, we remand for the entry of a corrected judgment relative to the initiation of a process to manufacture methamphetamine conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed;**
**Case Remanded**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROBERT L. HOLLOWAY, JR., JJ., joined.

William B. Hickman (on appeal) and Joseph A. Fanduzz (at hearing), Knoxville, Tennessee, for the appellant, Steven Q. Stanford.

Herbert H. Slatery III, Attorney General and Reporter; Robert W. Wilson, Assistant Attorney General; Jared Effler, District Attorney General; and Scarlett W. Ellis, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case arises from the following facts, as summarized by this court in the appeal of the convictions:

On April 21, 2009, the LaFollette Police Department received an alert regarding a reckless driver, who was possibly armed, driving a red Monte Carlo. Officer Pam Jarrett recognized the description of the vehicle and suspected that it belonged to the defendant. After verifying that it was the defendant's vehicle, she proceeded to travel to the address where the defendant resided. When she traveled by the home, she noted that the defendant's vehicle was not there. At the same time, Officer Jason Marlowe was also on the lookout for the vehicle in the defendant's neighborhood. He eventually stopped the car about one hundred and fifty feet from the residence. The defendant and a female passenger were inside the vehicle. Once the defendant was removed from the car, he gave consent for the vehicle to be searched. Officer Marlow found a lithium battery, fully intact, inside the glove box of the car.

Meanwhile, Officer Jarrett, a trained methamphetamine technician, had also returned to the scene. She approached the house and encountered the defendant's brother, Tamra Rasnick, and David Allen. Officer Jarrett asked the group if anyone had been cooking methamphetamine, and they responded in the negative. She also asked for permission to search the home, which was given by Rasnick and Allen, who stated that they were staying at the house while they were repairing it. After entering the home, officers found nothing in plain view. However, when Officer Jarrett searched the outside perimeter of the home, she discovered a still smoldering burn pile.

Based upon her experience, the materials she saw in the burn pile appeared to be of the type used in the manufacture of methamphetamine. She discovered coffee filters, four bottles which were melted down, measuring cups, lithium strips, a Walden-D allergy congestion pill box, blister packs, and plastic bags. She testified that the used lithium strips were consistent with coming from the type of battery found in the defendant's car. Officer Jarrett was also able to determine that one of the plastic bottles had been used as a "gas generator," which is classified as drug paraphernalia, to make methamphetamine and that, based upon her training, the process began no more than twelve hours previously. In the area, she also found tubing which tested positive for methamphetamine. Finally, in the burn pile, she discovered an AT&T telephone bill addressed to the defendant at that location. All the people present were detained for questioning after the discovery.

Based upon that discovery, Officer Jarrett returned to the inside of the house. In the trash can, she found a container of Morton salt, pseudoephedrine

blister packs, measuring utensils and cups, more coffee filters, and a Walgreen's receipt showing the purchase of the allergy medication. She also discovered Drano and a dismantled cold-pack, known to contain ammonia nitrate, both known ingredients in the manufacture of methamphetamine. According to the testimony of Officer Jarrett, based upon the presence of personal care items and of men's and women's clothing, it was apparent that people were living in the residence. She made clear in her testimony that it appeared that both of the residence's bedrooms were occupied. The defendant, Tamra Rasnick, and David Allen were arrested.

Subsequently, the three were indicted by a Campbell County grand jury for initiation of a process to manufacture methamphetamine and for felony possession of drug paraphernalia. A joint trial was held in January 2010, at which Officers Jarrett and Marlowe testified to the above-mentioned facts. At the trial, a third officer testified that late on the night before this incident, he had taken a deputy to the residence because he knew that to be the address at which the defendant lived. When they approached the house, they were greeted by the defendant and a half-clothed female inside the residence.

*State v. Steven Q. Stanford*, No. E2010-01917-CCA-R3-CD, 2011 WL 2681961, *1-2 (Tenn. Crim. App. July 11, 2011), *perm. app. granted* (Tenn. Oct. 25, 2011), *perm. app. dismissed as improvidently granted* (Tenn. July 6, 2012).

The Petitioner was convicted of initiation of a process to manufacture methamphetamine and misdemeanor possession of drug paraphernalia and sentenced to an effective thirty years. The Petitioner appealed, arguing that the evidence was insufficient to support his convictions, and this court affirmed the convictions. *See Steven Q. Stanford*, 2011 WL 2681961, at *4. The Petitioner filed a post-conviction petition, contending that he received the ineffective assistance of counsel relative to counsel's failure to file a motion to suppress the evidence obtained during the search of the house and the backyard, counsel's failure to explain the State's plea offers adequately and the sentence the Petitioner faced at the trial, and counsel's failure to ensure the Petitioner was sentenced within the correct range.

At the post-conviction hearing, the Petitioner testified that trial counsel visited him once in jail before the trial. The Petitioner said that he and counsel discussed some facts of the case and a plea offer from the State in which the Petitioner would serve three years in exchange for pleading guilty to promotion of methamphetamine manufacture. The Petitioner stated that he and counsel discussed the Petitioner's being stopped by the police in his car, his consenting to a search of the car while he was detained in a police cruiser, and the Petitioner's brother's and the codefendants' involvement in the case. The Petitioner said that

he told counsel the house belonged to his mother and that he was at the house to repair the roof as a caretaker of the property.

The Petitioner testified that counsel mentioned filing a motion to suppress the evidence found in the house but not a motion to suppress the evidence found in the Petitioner's car. The Petitioner said that he and counsel did not discuss the Petitioner's criminal history. The Petitioner stated that counsel told him he would "get a lot of time" if the case went to trial but that counsel did not tell him a specific range of punishment. The Petitioner said that on the morning of the trial, counsel asked if he wanted to accept the plea offer and that the Petitioner chose to reject it.

The Petitioner testified that the backyard of the house was "fairly private" and surrounded by weeds. He said he told trial counsel that his codefendants were working on the house and denied telling counsel the codefendants rented the house from his mother.

On cross-examination, the Petitioner testified that the State made a plea offer on the day of the preliminary hearing and that he rejected it. The Petitioner did not know if trial counsel spoke to him about the offer the day before the preliminary hearing. He said that he saw the discovery file before the preliminary hearing and that the State possessed his criminal record and photographs of the house. The Petitioner stated that counsel had represented him on previous charges and that he knew counsel well. The Petitioner acknowledged that he wrote personal letters to counsel and considered him someone with whom he could talk when he had questions. The Petitioner denied that counsel discussed potential defense witnesses. The Petitioner did not remember counsel saying he intended to call the Petitioner's mother as a witness, but the Petitioner later said he spoke with counsel about why counsel intended to call the Petitioner's mother. The Petitioner stated his mother testified at the trial that the Petitioner never lived at the house.

The Petitioner testified that he met with trial counsel two additional times before the trial and that counsel requested furloughs for the Petitioner to attend two funerals. The Petitioner did not remember when counsel visited him in jail. The Petitioner said that counsel mailed him the discovery materials and that he did not remember if he received the discovery materials before meeting with counsel. The Petitioner stated that on the first day of the trial, counsel discussed the plea offer with him and later told him the offer had been withdrawn. The Petitioner acknowledged telling counsel he wanted to go to trial. The Petitioner said that in previous criminal cases, he had told counsel he wanted to plead guilty if the State's evidence was too strong to overcome.

The Petitioner testified that he made clear to counsel he wanted to proceed to trial because he did not live at the house and did not believe the State could prove the charges

-4-

against him. He said that the State assumed the Petitioner would not go to trial. The Petitioner said that he did not testify at the trial, that the trial judge asked him questions about not testifying, that counsel decided the Petitioner would not testify, that the Petitioner agreed with counsel, and that the Petitioner told the trial court he would not testify. The Petitioner denied that he and counsel discussed before the trial whether the Petitioner would testify.

The Petitioner testified that counsel discussed filing a motion to suppress the evidence found in the house but said that counsel decided to focus on establishing the Petitioner did not live at the house. The Petitioner said that he and counsel never discussed the Petitioner's criminal history because counsel did not plan to go to trial. The Petitioner stated that counsel did not know whether the Petitioner planned to plead guilty before the trial.

The Petitioner testified that the burn pile behind the house was not visible from the driveway and that on the day of his arrest, the grass in the backyard had grown to just below the Petitioner's knee. The Petitioner estimated that the burn pile was sixty or seventy feet from the steps to the front door and said that the items in the burn pile had been destroyed such that "you'd have to get in there and dig around to even visually see something." The Petitioner acknowledged his mother's testimony that the burn pile had not been utilized since previous renters left in February before the Petitioner's arrest. The Petitioner said, "We had to burn some renters' stuff up." The Petitioner stated that he and counsel discussed the burn pile and its use.

The Petitioner testified that he told trial counsel that his mother touched the burn pile after his arrest, that the burn pile was not "smoldering" or "reacting," and that any vapor rising from the burn pile was a result of rain evaporating. The Petitioner said that nothing he discussed with counsel was presented at the trial. The Petitioner stated that he was on probation at the time of the trial and that he thought the plea offer included a provision that the three-year sentence would run concurrently with the remainder of his previous sentence.

On redirect examination, the Petitioner testified that he never received a notice to seek enhanced punishment, that he did not know he faced twelve to twenty years if convicted after a trial, that he did not know he could be sentenced to thirty years, and that this knowledge would have changed his consideration of the plea offers. The Petitioner said that he spoke to another attorney whose clients received three years' probation and that the Petitioner assumed his sentence would be similar.

The Petitioner testified that on the day of his arrest, he was stopped by the police for reckless driving but was not arrested for that charge. He said that his brother was present during a conversation at the house between Officer Jarrett, Ms. Rasnick, and Mr. Allen but that trial counsel never interviewed the Petitioner's brother.

On recross-examination, the Petitioner testified that his brother came to the car during the Petitioner's arrest. The Petitioner said that he had the discovery materials before the trial. He said, though, he did not receive a notice to seek enhanced punishment until after he "went to the Supreme Court." On further redirect examination, when asked how well he could read and write, the Petitioner said, "Not real well." The Petitioner stated that counsel never reviewed the discovery materials or explained them to him. He said that the reason he appealed his convictions was because he never received a notice to seek enhanced punishment. The Petitioner stated that he was present at the sentencing hearing and that no one reviewed with him his prior convictions contained in the presentence report.

Two written plea offers were received as exhibits. The first, dated June 2, 2009, offered four years consecutive to "any priors," with a $2000 fine, or alternatively, if the Petitioner was on probation, three years "consec to serve." The second, dated August 13, 2009, offered three years in exchange for a guilty plea to a Class D felony, promotion of methamphetamine manufacture. The offer stated that the sentence would run concurrently with a violation of probation, that the Petitioner would not pay a fine or court costs, and that the Petitioner would "waive PSI and serve. Submit to VOP."

Officer Pamela Jarrett, who worked for the LaFollette Police Department at the time of the incident, testified that on April 21, 2009, she received a "be on the lookout" (BOLO) notice from dispatch about a reckless driver, that dispatch described a red Monte Carlo, and that Officer Jarrett knew the Petitioner drove a red Monte Carlo. She said that the officers verified the license plate number was registered to the Petitioner's car. She stated that thirty to forty-five minutes after the BOLO notice, Officer Marlow reported he had stopped the Petitioner. Officer Jarrett said that she went to the area she knew the Petitioner lived, that Officer Marlow told her the Petitioner was on his way to his house, and that Officer Marlow said the Petitioner was following Officer Marlow's police cruiser extremely closely. Officer Jarrett stated that she was the only officer who charged the Petitioner with a crime and that she did not charge him with reckless driving. Officer Jarrett said she parked her police cruiser about 100 feet from the Petitioner's house. She stated that she asked the Petitioner's brother about the Petitioner's whereabouts.

Officer Jarrett testified that within minutes, the Petitioner and Officer Marlow arrived. Officer Jarrett said that Officer Marlow asked her to come to the Petitioner's car, that the Petitioner was accompanied by a woman, and that the Petitioner was standing at the rear of his car. Officer Jarrett stated that she spoke to codefendants Rasnick and Allen, that she asked them if she could search the house, and that when she asked for consent to search the house, she had not asked the Petitioner for consent to search the house. Officer Jarrett said that she walked between the house and the Petitioner's car multiple times, although she could not remember how many. Officer Jarrett said that before she went inside the house, Officer

Marlow told her that he had found "some items" inside the Petitioner's car. She stated that when she approached the Petitioner's car, the Petitioner was detained inside Officer Marlow's police cruiser.

Officer Jarrett testified that codefendants Rasnick and Allen told her they had been staying at the house to help repair it. Officer Jarrett said that she did not ask them whether they had a key to the house, how long they had been staying there, or whether they resided somewhere else. Officer Jarrett stated that codefendants Rasnick and Allen told her the Petitioner had also been staying there and that they were all repairing the house. Officer Jarrett said that other officers had gone to the house previously and had contact with the Petitioner, that the officers stated a woman had been in the house with the Petitioner, and that she did not know if the officers saw codefendant Rasnick or codefendant Allen.

Officer Jarrett testified that she searched the house and did not find any evidence. She said that she walked into a side yard next to the house and found a burn pile about ten feet from the steps. She said that after searching the burn pile, she searched the house again, and that she recovered methamphetamine precursors inside and outside the house.

Officer Jarrett testified that she used codefendants Rasnick's and Allen's identifications to run a National Criminal Information Center (NCIC) background check and that in her experience, the address listed on a driver's license was rarely correct. Officer Jarrett said that she asked the Petitioner and the Petitioner's brother whether they were staying at the house and that she asked the Petitioner what codefendants Rasnick and Allen were doing in the house. Officer Jarrett stated that the Petitioner told her he and codefendants Rasnick and Allen were repairing the house.

On cross-examination, Officer Jarrett testified that Officer Marlow told her the Petitioner followed Officer Marlow in his car so closely that the Petitioner's car almost hit Officer Marlow's car. Officer Jarrett said that she was familiar with the Petitioner and his brother and that when she heard the BOLO for a red Monte Carlo, she automatically thought it referred to the Petitioner and his brother. She stated that the Petitioner's brother denied staying at the house and that Ms. Rasnick gave her consent to search the house. On redirect examination, Officer Jarrett said that when the Petitioner gave Officer Marlow consent to search his car, the Petitioner was inside Officer Marlow's police cruiser.

Trial counsel testified that he did not file a motion to suppress the search of the Petitioner's car because the Petitioner consented to the search. Counsel said that he was involved in the Petitioner's preliminary hearing and that he spoke to the Petitioner about his trial and the facts surrounding the traffic stop. Although counsel did not remember how many times he met or spoke with the Petitioner, counsel said that the Petitioner "was kept up

to date on everything that was going on all the way through the appeal." Counsel stated that he met with the Petitioner in jail more than once and that counsel normally met with clients before the preliminary hearing.

Trial counsel testified that on the day of the preliminary hearing, he received a plea offer from the State, that he discussed the offer with the Petitioner, and that the Petitioner decided not to accept it. When asked whether he and the Petitioner spoke to one another during the preliminary hearing, counsel responded that he was sure if the Petitioner "had something to tell me," counsel would have listened. Counsel said that he had known the Petitioner for a long time, that he had previously represented the Petitioner, and that he thought he and the Petitioner had a good relationship. Counsel stated that the Petitioner was an "honest person and he'll tell you . . . what's on his mind" and that counsel did not remember the Petitioner's complaining about counsel.

Trial counsel testified that the Petitioner wrote counsel letters detailing research the Petitioner had done on his case and that the Petitioner did not complain about counsel's representation in the letters. Counsel denied having any problems communicating with the Petitioner. Counsel said that the Petitioner's mother came to his office twice and discussed the Petitioner's case. Counsel stated that he and the Petitioner spoke about counsel's discussions with the Petitioner's mother and her expected trial testimony. Counsel acknowledged the Petitioner's mother's testimony that neither of her sons lived in the house.

When asked why he did not file a motion to suppress the evidence obtained as a result of the search of the house, trial counsel testified that he did not believe the Petitioner had standing to file a motion to suppress because the Petitioner said he did not live in or own the house. Counsel said the Petitioner did not know about, possess, or have any connection with items in the house. Counsel said that the theory of the case was that the Petitioner did not know anything about the items in the house or in the burn pile, that the Petitioner was not present when the police arrived at the house, and that the Petitioner was not living in the house.

Trial counsel testified that in order to investigate the case, he participated in the preliminary hearing, spoke to the Petitioner, the Petitioner's mother, and the arresting officer, and reviewed the State's discovery materials. Counsel said that he reviewed the discovery materials with the Petitioner at the jail. Counsel did not remember whether he interviewed the Petitioner's neighbor, who was a witness for the State at the trial. Counsel said that he did not interview the Petitioner's brother because he had a criminal history and because the Petitioner's mother would testify about her ownership of the house.

Trial counsel testified that the Petitioner's mother established the Petitioner was only a caretaker present at the house to make repairs, that the Petitioner's mother had a telephone line registered in the Petitioner's name in order to prevent bothering the neighbors when they needed a telephone, and that the Petitioner's mother was in a better position to establish this information than the Petitioner's brother. Counsel said that the Petitioner's mother and the Petitioner's neighbor testified that the Petitioner had not lived at the house for two years.

Trial counsel testified that he reviewed a second plea offer with the Petitioner, that he did not remember whether the Petitioner had questions about it, and that the offer was "pretty straightforward." Counsel said the offer was for three years for a reduced charge, with the sentence to run concurrently with a probation violation. Counsel stated that the Petitioner rejected the offer because the Petitioner said he was innocent.

Trial counsel identified the plea offer made at the preliminary hearing. Counsel said the offer was for the Petitioner to plead guilty to a Class C felony and receive a four-year sentence that would be served consecutively to his prior convictions. Counsel said that if the Petitioner was on probation, he would receive three years to be served consecutively to any priors. Counsel said that he reviewed the offer with the Petitioner and that the Petitioner rejected it.

On cross-examination, trial counsel testified that at the preliminary hearing, he cross-examined Officer Jarrett. Counsel stated that the police believed the Petitioner lived at the house and that counsel did not remember whether he asked Officer Jarrett about the basis of her belief that codefendant Rasnick lived at the house.

Trial counsel testified that based upon the Petitioner's telling counsel he did not live at the house, counsel did not believe the Petitioner had standing to file a motion to suppress the items found during the search of the house. Counsel said that the Petitioner would have testified at a suppression hearing, that counsel did not file a motion to suppress the items found in the Petitioner's car because counsel thought Officer Marlow had probable cause to stop the Petitioner, and that the Petitioner consented to the search. Counsel stated that he remembered reviewing the discovery materials with the Petitioner, although counsel did not remember a date. Counsel said that he knew the Petitioner had trouble reading and writing, that if it had been necessary, counsel would have reviewed each page of the discovery materials with the Petitioner, and that counsel did not remember reviewing every page of the discovery materials with the Petitioner. Counsel stated he told the Petitioner that given the Petitioner's criminal history, the Petitioner was eligible to be sentenced as a Range II offender.

When asked whether trial counsel objected to the trial court's sentencing the Petitioner as a Range III offender, counsel testified that he argued for the Petitioner to be sentenced as a Range II offender and said, "[W]hen I make my position known to the Judge and he rules as he sees fit, I'm not gonna stand there and argue with him." Counsel said that he received the presentence report a week before the sentencing hearing and that an amendment was added to the report on the day of the hearing. Counsel stated that the presentence report did not accurately list the Petitioner's criminal history and that the court agreed to use materials the State provided instead. Counsel said that he did not file a sentencing memorandum and that he stated his position during argument. Counsel stated that he argued against all the enhancement factors at the hearing.

Trial counsel testified that although he was aware the Petitioner's brother witnessed codefendant Rasnick's consenting to the search, he did not interview the Petitioner's brother because counsel spoke to the Petitioner's mother instead. Counsel acknowledged that the Petitioner's mother was not present for the search of the house. On redirect examination, counsel said that he raised sufficiency of the evidence at the motion for a new trial and on appeal, that the Court of Criminal Appeals upheld the convictions, and that the Petitioner's brother had a prior conviction for perjury.

The post-conviction court granted relief for the Petitioner's challenge relative to his sentencing range. The State and the Petitioner agreed that the Petitioner had been incorrectly sentenced as a Range III, persistent offender, and that he should have been sentenced as a Range II, multiple offender. At a resentencing hearing, the post-conviction court reduced the Petitioner's sentence to an effective fifteen years and denied relief relative to the remaining issues. The court stated on the record the following findings of fact and conclusions of law:

> The Court finds that the petitioner's testimony regarding trial preparation was not credible. Asserting [trial counsel] met with him only once prior to trial is belied by evidence of multiple meetings at various stages of the case with petitioner and family members. Further, petitioner's lack of specificity regarding other errors by [counsel] weigh against his version of these transactions and . . . in favor of the respondent[.]

> Secondly, [trial counsel] explained his reasoning for failure to seek suppression as based on his perception the petitioner . . . had no standing to contest the seizure of the evidence. This notion is consistent with petitioner's defense throughout the trial. This strategic decision by [counsel] cannot now be raised as a basis for ineffectiveness. Based on the proof and on the claims and pleadings offered at trial, this was sound strategy, and the petitioner's claim is without merit.

-10-

The sentencing issue from a technical standpoint must be resolved in the proceeding. The failure to properly advise a defendant of a potential sentence may suggest ineffective assistance of counsel. In this case, there was no proof that petitioner's decision making was affected by a mistaken sentence calculation. It is clear that the [Petitioner] unequivocally rejected a term less than he might receive, even had he been given the proper advice. This mistake, standing [alone], does not constitute ineffective assistance of counsel.

This appeal followed.

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2014). A petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f) (2014). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996).

To establish the performance prong, a petitioner must show that "the advice given, or the services rendered . . . , are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The post-conviction court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A petitioner "is not entitled to the benefit of

-11-

hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008). This deference, however, only applies "if the choices are informed . . . based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

To establish the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

## I. Motion to Suppress

The Petitioner contends that he received the ineffective assistance of counsel because trial counsel did not file a motion to suppress the evidence obtained during the search of the house and the search of the curtilage. The State responds that counsel's performance was not deficient and that the Petitioner was not prejudiced by counsel's actions.

The Fourth Amendment of the United States Constitution and Article 1, section 7 of the Tennessee Constitution guarantee freedom from unreasonable searches and seizures. As a general principle, the police cannot conduct a search without obtaining a warrant. *R.D.S. v. State*, 245 S.W.3d 356, 365 (Tenn. 2008) (citing *Payton v. New York*, 445 U.S. 573, 586 (1980)). However, our courts have identified narrow exceptions to the warrant requirement, including when a person consents to a search. *State v. Bartram*, 925 S.W.2d 227, 229-30 (Tenn. 1996) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971)). A consent search of a residence is valid only if the arresting officer reasonably believed the person who gave consent had "common authority" over the space. *State v. Talley*, 307 S.W.3d 723, 734 (Tenn. 2010). Constitutional protections against unreasonable search and seizure extend to the curtilage of a house, which is defined as "any area adjacent to a residence in which an individual can reasonably expect privacy." *Id.* at 729 (citing *Oliver v. United States*, 466 U.S. 170, 180 (1984)); *see* State *v. Prier*, 725 S.W.2d 667, 671 (Tenn. 1987).

A reasonable expectation of privacy is an individual right, and a person must have an interest in the place or items searched in order to have standing to challenge a search as unconstitutional. *Id.* at 730. Our supreme court has identified several factors for courts to use when considering whether a person has standing to challenge a search:

> (1) [whether the defendant owns the property seized]; (2) whether the defendant has a possessory interest in the thing seized; (3) whether the defendant has a possessory interest in the place searched; (4) whether he has the right to exclude others from that place; (5) whether he has exhibited a

subjective expectation that the place would remain free from governmental invasion; (6) whether he took normal precautions to maintain his privacy; and (7) whether he was legitimately on the premises.

*Id.* at 731 (quoting *State v. Ross*, 49 S.W.3d 833, 841 (Tenn. 2001) (internal citations omitted)). In addition, if a defendant disclaims ownership of the property, the defendant forfeits any expectation of privacy in it. *Ross*, 49 S.W.3d at 841.

In this case, trial counsel testified that the Petitioner told him the Petitioner did not live at the house, that the Petitioner's mother owned the house, and that the Petitioner was staying at the house temporarily while carrying out repairs. Counsel said that he spoke with the Petitioner's mother and that she testified at the trial relative to the Petitioner's not living at the house and to why the Petitioner's name appeared on the telephone bill.

Given counsel's chosen trial strategy of establishing that the Defendant was not staying at the house and was unaware of the illegal activity in the house, a motion to suppress was not appropriate. A motion to suppress relative to the search would necessarily have involved establishing the Petitioner's standing to challenge the search, that is, that he lived in the house or was staying in the house and had an expectation of privacy. If counsel established at a suppression hearing that the Petitioner lived or was staying in the house, he could not then ethically present evidence at the trial that the Petitioner did not live in or stay at the house. *See* Tenn. R. Sup. Ct. 8, 3.3(b) (an attorney shall not "offer evidence the lawyer knows to be false."). We note the Petitioner's testimony that he "made clear" to counsel he did not live at the house. Counsel's decision was tactical and supported by adequate preparation and by the information provided to counsel by the Petitioner and the Petitioner's mother. Counsel's performance was not deficient in this regard.

Relative to prejudice, the Petitioner's position throughout the proceedings was that he did not live at the house and, therefore, the Petitioner's lack of standing would have precluded a successful motion to suppress. The Petitioner was not prejudiced by counsel's decision not to file a motion to suppress. The record does not preponderate against the post-conviction court's determination that counsel did not provide ineffective assistance. The Petitioner is not entitled to relief on this basis.

## II. Plea Offer

The Petitioner contends that he received the ineffective assistance of counsel because trial counsel did not explain the State's plea offer adequately or the sentence the Petitioner faced at the trial.

The post-conviction court found that the Petitioner "unequivocally rejected a term less than he might receive, even had he been given the proper advice." The record supports the court's finding that at the sentencing hearing, counsel mistakenly agreed with the State that the Petitioner qualified as a Range III offender. However, counsel testified at the post-conviction hearing that before the trial, he thought the Petitioner qualified as a Range II offender and explained to the Petitioner the potential sentence he faced after a trial. Counsel said that he explained each of the two plea offers to the Petitioner and that the Petitioner rejected the offers and wanted to proceed to trial because the Petitioner said he did not live at the house and had not committed a crime. Counsel noted that he had previously represented the Petitioner, that the Petitioner readily took responsibility and admitted guilt in those cases, and that the Petitioner maintained he was innocent in this case.

The post-conviction court discredited the Petitioner's testimony that counsel did not advise him relative to the sentence he faced at a trial. The court found that even if counsel had advised the Petitioner correctly, the Petitioner would not have accepted an offer. The evidence does not preponderate against the court's determination that no prejudice resulted. The Petitioner is not entitled to relief on this basis.

### III. Clerical Error

Our review of the record reflects that the amended judgment for Count 1, initiation of a process to manufacture methamphetamine, shows the Petitioner was sentenced as a persistent offender. However, the resentencing hearing transcript reflects that the Petitioner was sentenced as a multiple offender. We remand the judgment to the post-conviction court for correction of the offender status to reflect multiple offender status. *See* T.R.A.P. 36(b); Tenn. R. Crim. P. 36.

In consideration of the foregoing and the record as a whole, we affirm the judgment of the post-conviction court and remand the judgment in Count 1 for correction of the clerical error.

_____
ROBERT H. MONTGOMERY, JR., JUDGE